ID# 2018-0123159-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
J. Stephen Schuster - 48
AUG 30, 2018 04:56 PM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | |
| **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **FILE NO. ______________** |
| **COLLABERA INC. and JEFFREY LUMA,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Randstad Technologies, LLC ("Randstad") files this Complaint for Injunctive Relief and Damages ("Complaint") against Defendants Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma") (together, "Defendants").

**INTRODUCTION**

1. This is an action by Randstad, a Cobb County business, for damages and injunctive relief arising out of Defendants' scheme to unfairly compete against Randstad. In this lawsuit, Randstad seeks to enforce an agreement that multiple Georgia courts have found to be enforceable and to prevent Luma (a former Randstad senior executive) and his new employer (a direct competitor of Randstad) from misappropriating Randstad's confidential and proprietary information and trade secrets and engaging in other actions in violation of Defendants' common law, statutory, and contractual duties to Randstad.

2. As detailed below, on July 27, 2018, Luma abruptly announced that he was resigning his employment as a Region President East for Randstad's eastern region, and has since accepted employment with Collabera as its Chief Strategy Officer, a directly competitive position, in a blatant disregard for a non-compete covenant in his written employment agreement with

Randstad. Upon information and belief, Luma is currently in possession of proprietary Randstad trade secrets and information and is using or planning to use such information-- including his detailed knowledge of Randstad's confidential business and sales strategies -- to unfairly compete against Randstad on behalf of and at the behest of his new employer. Accordingly, Randstad seeks injunctive relief to prevent the immediate irreparable harm that arises from this unfair competition, as well as damages and the costs of this action, including its reasonable attorneys' fees.

**PARTIES, JURISDICTION, AND VENUE**

3. Plaintiff Randstad is a Delaware limited liability company with a corporate office and principal place of business located at One Overton Park, 3625 Cumberland Blvd SE, Atlanta (Cobb County), GA 30339. Randstad is registered to conduct business in Georgia.

4. Defendant Luma is an individual who resides at 66 Upper Prospect Road, Atlantic Highlands, NJ 07716. Until his resignation on July 27, 2018, Luma served as Region President East of Randstad Technologies, LLC, and routinely traveled to Randstad's corporate headquarters in Atlanta, Georgia. Luma is subject to the jurisdiction of this Court under the authority of O.C.G.A.§§ 9-10-91 and pursuant to the exclusive jurisdiction and venue provision in his Executive Non-Competition and Confidentiality Agreement with Randstad ("Agreement"). A true and accurate copy of the Agreement is attached hereto as **Exhibit A**.

5. Defendant Collabera is a New Jersey corporation with a principal place of business located at 110 Allen Road, Basking Ridge, NJ 07920. Upon information and belief, Collabera maintains an office and regularly transacts business in the State Georgia and is subject to the jurisdiction of this Court under the authority of O.C.G.A.§ 9-10-91. Moreover, upon information and belief, Collabera is subject to the jurisdiction of this Court because it knew, at all relevant times, that Luma was bound by the Agreement, in which Luma agreed to the jurisdiction of this

Court, but tortiously interfered with Luma's contractual obligations to Randstad under the Agreement despite its knowledge of the forum selection clause in the Agreement; it is "closely related" to Luma, and is, therefore, bound by the same mandatory forum selection clause; its actions were so inextricably intertwined with Luma's breach of the Agreement that it foresaw or reasonably should have foreseen being bound by the forum selection clause in the Agreement; and the effect and harm of the tortious activity undertaken by Collabera as alleged herein is felt in Cobb County, Georgia and has harmed Randstad in Cobb County, Georgia.

6. This Court has jurisdiction over the subject matter of this Complaint, which consists of torts, breaches of contract, and statutory violations that occurred and are occurring in Cobb County, Georgia, where Randstad is headquartered.

7. Venue is proper in this Court under the authority of Ga. Const. 1983, Art. VI, § II and O.C.G.A.§§ 9-10-93 and pursuant to the exclusive venue provision in the Agreement because Luma is a party to an employment agreement that was made and was to be performed, in part, in Cobb County, and because some or all of the actions that form the basis of Randstad's claims occurred and are occurring in Cobb County, Georgia, where Randstad is headquartered and where Randstad has felt the effect and harm of the torts, breaches of contract, and statutory violations alleged in this Complaint.

## FACTS

### A. ***Randstad's Business and Confidential Information.***

8. Randstad is a leader in the staffing solutions industry. Randstad and its affiliates provide individual employees ("Talent") to a diverse portfolio of businesses and organizations ("Customers") nationwide on a temporary or permanent basis to meet the Customers' needs.

Randstad Technologies specializes in placing temporary employees in information technology ("IT") positions in a variety of industries.

9. The staffing industry is a highly competitive, specialized business that is relationship-driven between Customers, Talent, and the sales force. Through decades of hard work, dedication, innovation and investment, Randstad has become a leader in the staffing industry.

10. Randstad invests heavily in developing and maintaining Customer relationships and in attracting and retaining top employees and Talent for both its internal operations and for assignments with its Customers.

11. Randstad's success in the highly competitive staffing industry is directly dependent on its staffing teams' Customer and institutional knowledge and Randstad's ability to provide top quality Talent to its Customers, and top quality job placements to its Talent.

12. To meet its Customers' expectations and needs, Randstad has developed and maintained, at great expense, valuable and long-standing working relationships and substantial goodwill with its Customers.

13. Randstad has reasonably come to expect that its long-standing Customer relationships will continue into the future.

14. Randstad's employees, including Luma, receive substantial training, information, business contacts, and other advantages that provide Randstad with a competitive advantage in the marketplace.

15. Until his resignation on July 27, 2018, Luma served as the Region President East for Randstad, and had high-level responsibility for developing, implementing, and managing Randstad's business and sales strategies.

16. As Region President East for Randstad, Luma gained unique knowledge of and had access to Randstad's trade secrets and other confidential and proprietary information, including, without limitation, information relating to Randstad's business strategies, finances, methodologies, processes, operations, pricing, Customers, Talent and employees ("Confidential Information").

17. Indeed, as a top executive at Randstad, Luma was not only privy to Randstad's Confidential Information but was personally responsible for developing Randstad's most sensitive and confidential business and sales strategies.

18. The Confidential Information to which Luma had access during his employment with Randstad is critical to Randstad's competitive position in the staffing industry.

19. Randstad developed such Confidential Information at significant expense and effort over a number of years, such information is not generally available to the public or Randstad's competitors, and Randstad derives economic value from this information.

20. Randstad also takes reasonable efforts to maintain the confidentiality of such information, including having its employees with access to such information sign confidentiality agreements and using password protected computers and password protected log-ins to Randstad's databases.

21. If Randstad's Confidential Information were to fall into the hands of a competitor, such as Collabera, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge. Likewise, if a former employee, such as Luma, retained Plaintiff's Confidential Information after his employment ended and/or used the Confidential Information while working for a competitor,

Randstad's competitive position would be seriously harmed and both Luma and the competitor would have an unfair competitive advantage.

**B. *Luma's Employment with Plaintiff and Access to Randstad's Confidential Information***

22. Luma joined Randstad as an account manager in 2004, selling Randstad's services to clients based in New Jersey, New York, and eastern Pennsylvania.

23. In 2005, Luma was promoted to Managing Director. In that role, he had full profit and loss (P&L) responsibility for and oversight of Randstad's Edison, New Jersey branch.

24. In 2009, Luma was again promoted, this time to Region Managing Director. In that role, he had full P&L responsibility for both of Randstad's New Jersey offices.

25. In 2010, Luma's territory was expanded to include additional offices in the New York/New Jersey market.

26. In 2013, Luma was again promoted, this time to Vice President of National Strategic Sales. In this role, he was responsible for managing Randstad's sales strategies for the entire northern half of the United States for Randstad's National Strategic Organization. This role also entailed the development and management of Randstad's sales strategies with regard to many of Randstad's largest Customers.

27. Finally, in 2018, Luma was promoted to Region President East, in which he was responsible for developing sales strategy and managing sales execution for all lines of business for Randstad's Eastern Region. He had full P&L responsibility for an organization that has approximately $600 million in revenue and approximately 200 employees, including eight direct reports.

28. Through his employment with Randstad, Luma gained highly detailed knowledge of and had access to Randstad's Confidential Information. Indeed, as a top executive, Luma was

not only privy to Randstad's Confidential Information but was personally responsible for developing and executing Randstad's most confidential business and sales plans and strategies.

29. For example, on a regular basis during his tenure at Randstad and continuing until the day of his resignation, Luma received, reviewed, and in many cases prepared documents containing Randstad's most confidential sales strategies and other sensitive business information. Such Confidential Information included, but was not limited to, (a) Randstad's digital strategy, (b) marketing strategies, (c) growth strategies and methodologies, (d) plans for business and service concepts under development by Randstad, (e) identification of large Customers and prospects, (f) pricing offered to large Customers and prospects, (g) sales pitches and proposals, (h) sales strategies generally and with specific Customers, and (i) field steering (i.e., Randstad's expectations for individual branch offices on a daily basis).

30. In fact, right up to the day of his resignation from Randstad, Luma not only had access to such confidential sales strategies but was intimately involved in developing and implementing such strategies on a nationwide basis with me and other senior leaders.

31. Luma had access to multiple pricing and strategy documents during his employment that contain highly confidential information that, if used by a competitor, would allow the competitor to undercut Randstad's pricing. In addition, they provide confidential data about Randstad's conversion rates, profitability, and other key performance metrics. If obtained by a competitor, such information would allow a competitor to replicate Randstad's business plans and strategies and potentially challenge Randstad's market position.

32. These are only examples of the extremely sensitive Confidential Information to which Luma had access while at Randstad. As a senior executive, he was regularly included in

highly confidential meetings with other senior leaders in which the Company's long-term and short-term strategies were discussed.

33. In short, the information to which Luma had access as Region President East constitutes the essence of Randstad's business and sales plans and strategies and the precise DNA for the services Randstad provides to its customers. It is precisely the type of information that a competitor would need to replicate Randstad's business strategies in the staffing industry and, thereby, displace Randstad's market position.

**C. *The Agreement***

34. On June 23, 2015, Luma executed the Agreement. He previously had been subject to prior versions of the Agreement.

35. Among other provisions, the Agreement provides in Section 3(a):

> The Employee acknowledges that Confidential Information and Trade Secrets are valuable, special and unique assets of the Company's business. In the course of Employee's employment with the Company, the Company will disclose to Employee and grant Employee access to Confidential Information and Trade Secrets, and Employee desires to be, and will be, entrusted with such Confidential Information and Trade Secrets during employment by the Company. In consideration of the Company's entrusting to the Employee certain of its Confidential Information and Trade Secrets, the Employee shall not directly or indirectly reproduce, use, distribute, disclose, publish, or misappropriate any Confidential Information or Trade Secrets on behalf of Employee or any person or entity other than the Company for any purpose whatsoever (i) at any time during Employee's employment with the Company, and (ii) after Employee's separation from employment with the Company (for any reason) for so long as the information in question meets the definition of Confidential Information set forth in Section 2(b), up to a maximum of two (2) years from the date of such separation of employment; provided that as to any Confidential Information that constitutes a Trade Secret under applicable law, these restrictions shall apply for so long as the information remains a Trade Secret. The Employee acknowledges that any such prohibited use or disclosure of Confidential Information or Trade Secrets is likely to cause irreparable harm and financial loss to the Company.

36. The Agreement also provides in pertinent part in Section 4(d):

> During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory[1], directly or indirectly, on Employee's own behalf or on behalf of any person or entity other than the Company, hold any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company [defined as "the services provided by the Company, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, payrolling, recruitment process outsourcing, independent contractor assessment and placement, HR and management consulting, managed services, or other services that are the same as or substantially similar to the services Employee provided on behalf of the Company within two (2) years prior to the date of Employee's separation from the Company"] if such position involves:
>
> (i) providing products or services competitive with the Business of the Company;
>
> (ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company;
>
> (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or

---

[1] The term "Restricted Territory" is defined in the Agreement as "the following geographic territory to the maximum extent determined to be reasonable by a court of competent jurisdiction:

> (i) a radius of twenty-five (25) miles of any office(s) to which Employee was assigned or which Employee managed, during the twelve (12) months prior to the date of Employee's separation of employment with the Company;
>
> (ii) a radius of twenty-five (25) mils of any office(s) in which Employee performed services on behalf of the Company at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company;
>
> (iii) a radius of twenty-five (25) mils of any office(s) in which the Company employed personnel whom Employee directly or indirectly supervised or managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and
>
> (iv) any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company."

(Ex. A. at § 2(f).)

> (iv) engaging in responsibilities in which Employee would utilize or disclose Confidential Information.

37. The Agreement further provides in Section 6:

> The Employee acknowledges that all originals, copies and summaries of manuals, memoranda, notes, notebooks, records, reports, plans, computer-based data in any form, tabulations or compilations, and other documents or items of any kind concerning any matters affecting or relating to the present or potential business of the Company, whether or not they contain Confidential Information or Trade Secrets, and all Company-owned equipment which may be provided for Employee's use while employed by the Company, are and shall continue to be the property of the Company. The Employee shall return to the Company all such documents and equipment in the possession or under the control of the Employee immediately upon the date of Employee's separation of employment with the Company or sooner if requested by the Company.

38. Moreover, the Agreement provides in Section 8:

> The Employee acknowledges that the Company will suffer irreparable injury and damage and cannot be reasonably or adequately compensated in monetary damages alone for the loss by the Company of its benefits or rights under this Agreement as the result of a breach, default or violation by the Employee of any of his or her obligations under this Agreement. Accordingly, the Company shall be entitled, in addition to all other remedies which may be available to it (including monetary damages), to injunctive and other available equitable relief in any court of competent jurisdiction in Cobb County, Georgia to prevent or otherwise restrain or terminate any actual or threatened breach, default or violation by the Employee of any provision of this Agreement or to enforce any such provision. The Company will not be required to post any bond as a condition of the Company receiving such injunctive relief, and the Employee hereby specifically waives the right to request or require the posting of a bond as a condition of the Company receiving injunctive relief. The Employee shall reimburse the Company for all reasonable legal fees and costs incurred by the Company in connection with bringing a successful action to enforce this Agreement

39. The Agreement is governed by the laws of the State of Georgia. (*See* Agreement at ¶ 12.)

40. Luma and Randstad also agreed that:

> Any claims arising out of or related to the covenants in Sections 3, 4, 5, and 6 of this Agreement, all claims arising under applicable law governing trade

> secrets, and all claims for emergency injunctive relief, must be litigated exclusively in the Superior or State Courts of Cobb County, Georgia, provided, however, that any such claim or cause of action may be brought in, or removed to, the United States District Court for the Northern District of Georgia, Atlanta Division, to the extent that such court would have jurisdiction over the subject matter of such action. The Employee and the Company waive any objection based on personal jurisdiction and forum non conveniens and waive any objection to venue of any action instituted hereunder to the extent that an action is brought in the courts identified above.

(*See id.*)

**D. *Luma's Abrupt Resignation from Randstad and Breach of the Agreement***

41. On July 27, 2018, Luma suddenly and unexpectedly announced that he was resigning, and his last day with Randstad was July 31, 2018. resigned his employment with Randstad effective immediately.

42. Although Randstad repeatedly asked Luma to identify his new employer, both before and after his departure, Luma refused to identify his new employer, claiming that he could not do so for three weeks, without providing an explanation as to why.

43. During his exit interview, Luma was reminded of his ongoing contractual obligations to Randstad, including his covenant not to compete.

44. Approximately three weeks later, Luma reported to Randstad that he had accepted employment with Collabera as its Chief Strategy Officer. Upon information and belief, Luma will be responsible in this role for developing, implementing, and managing Collabera's business and sales strategies in the IT staffing industry nationwide, including in the eastern part of the United States.

45. Collabera is a direct competitor with Randstad and specializes in IT staffing services. Upon information and belief, Collabera is the largest privately-held technology company in New Jersey, by revenue, with approximately $525 million in revenue.

46. Upon information and belief, Collabera solicited and hired Luma to exploit Luma's knowledge of Randstad's Confidential Information -- and particularly his detailed knowledge of Randstad's business and sales strategies and methodologies -- with the specific goal of unlawfully replicating Randstad's success in the IT staffing industry and growing its market position at the expense of Randstad.

47. Indeed, for the past several years, Collabera has attempted to recruit several Randstad senior executives, including Mr. Luma, and including for the CSO role. It is apparent from these repeated attempts that Collabera is intent upon obtaining Randstad's Confidential Information so that it can compete unfairly with Randstad.

48. Moreover, upon information and belief, Collabera solicited and hired Luma with knowledge of Luma's continuing obligations to Randstad.

49. Notwithstanding these continuing obligations, Collabera has hired Luma in a role that necessarily will cause Luma to violate his obligations to Randstad. Indeed, Luma's employment with Collabera is a blatant violation of the non-compete covenant in Section 4(d) of the Agreement, which expressly prohibits Luma from, among other activities, (i) "providing products or services competitive with the Business of the Company," (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company," (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information."

50. Because of Luma's departure, his knowledge of and access to Randstad's confidential, proprietary and/or trade secret information, and his retention and actual or threatened use of Randstad's confidential, proprietary and/or trade secret information to compete with

Randstad on behalf of Collabera, Randstad is threatened with losing substantial business and the loss of value of its goodwill, customer relationships, and Confidential Information, which cannot be adequately addressed at law. Money alone cannot make Randstad whole and Randstad continues to be irreparably harmed.

**COUNT I**
**Breach of Contract**
**(Against Luma)**

51. Plaintiff repeats and re-alleges Paragraphs 1 – 50 above, and incorporates them as if fully set forth herein.

52. Luma entered into a valid and enforceable Executive Non-Competition and Confidentiality Agreement.

53. The covenants contained in the Agreement remain in full force after Luma's departure from Randstad, and Luma remains bound by those covenants.

54. Plaintiff satisfied all of its obligations under the terms and conditions of the Agreement.

55. By the acts described above, Luma has breached the Agreement by, among other things, competing against Randstad and on behalf of Collabera within the Restricted Territory; and using or threatening to use Randstad's Confidential Information to compete against Randstad during the twelve-month period following his departure from Randstad.

56. As a result of Luma's breaches of the Agreement, Randstad has suffered or will suffer monetary damages and substantial irreparable harm, and is threatened with further irreparable harm for which there is no adequate remedy at law to compensate.

57. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT II**
**Intentional Interference With Contractual Relations**
**(Against Collabera)**

58. Randstad repeats and re-alleges Paragraphs 1 – 57 above, and incorporates them as if fully set forth herein.

59. Randstad has a valid and enforceable contractual relationship with Luma by virtue of the Agreement.

60. Randstad had a reasonable expectation that these contractual relationships would continue and that Luma would comply with the provisions of the Agreement.

61. Upon information and belief, Collabera had knowledge of Randstad's contractual relationship with Luma and his obligations thereunder.

62. By the acts described above, Collabera has intentionally interfered with Randstad's contractual relationship with Luma.

63. Collabera knew or should have known that Luma's acceptance of employment with Collabera in a directly competitive role would constitute violations of the Agreement, but upon information and belief, Collabera nevertheless induced Luma to engage in such violations of the Agreement.

64. By the acts described above, Collabera had an improper motive and used improper means in interfering with Randstad's contractual relations without lawful justification or legitimate reason for this interference with those business relationships.

65. As a direct and proximate result of Collabera's actions described above, Randstad has suffered and continues to suffer irreparable harm and monetary damages.

66. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT III**
**Violation of the Georgia Trade Secrets Act**
**(Against Collabera and Luma)**

67. Plaintiff repeats and re-alleges Paragraphs 1 – 66 above, and incorporates them as if fully set forth herein.

68. The Trade Secrets Act, O.C.G.A. §§ 10-1-760, *et seq.* (the "Act"), prohibits any person from misappropriating trade secrets by improper means, e.g., theft, bribery, breach of contract or other duty, including inducement of such breach.

69. "Misappropriation" is defined by the Act to include:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (i) Used improper means to acquire knowledge of a trade secret;
>
> (ii) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was
>
> (I) Derived from or through a person who had utilized improper means to acquire it;
>
> (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use; or
>
> (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.C.G.A. § 10-1-761(2)(B).

70. The "actual or threatened misappropriation [of a trade secret] may be enjoined." O.C.G.A. § 10-1-762. In addition to or in lieu of injunctive relief, a person is entitled to recover damages for trade secret misappropriation. O.C.G.A. § 10-1-763.

71. The Act defines "trade secret" as follows:

> [I]nformation, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).

72. By virtue of his employment with, and performance of responsibilities for, Randstad, Luma was given access to and now possesses trade secrets and other confidential and proprietary business information belonging to Randstad, including, without limitation, the extensive information about Randstad's business and sales strategies, and Customers.

73. Randstad undertakes substantial and reasonable efforts to maintain the secrecy of its trade secrets, including, without limitation, placing password protections on company e-mail accounts, servers, and devices and requiring employees to execute agreements with confidentiality and other restrictive covenants like those in the Agreement.

74. Upon information and belief, Luma retained and is currently in possession of Randstad's trade secrets and has used and disclosed or threatens to use and disclose such trade

secrets to compete unfairly against Randstad for the benefit of himself and his new employer, Collabera.

75. Luma's retention and actual and/or threatened use and disclosure of Randstad's trade secrets in his capacity as an employee and for the benefit of Collabera constitute misappropriation of Randstad's trade secrets in violation of the Act.

76. Upon information and belief, Collabera has failed to take sufficient action to prevent Luma from using or disclosing Randstad's trade secrets.

77. As a result of the Defendants' wrongdoing, Randstad has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss and use by the Defendants of its trade secrets, for which there is no adequate remedy at law to compensate.

78. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT VII**
**Punitive Damages**
**(Against Collabera and Luma)**

79. Randstad repeats and re-alleges Paragraphs 1 – 78 above, and incorporates them as if fully set forth herein.

80. Defendants' actions have been willful and malicious and were intended to harm Randstad and were in reckless disregard of the rights of Randstad and of the consequences to Randstad. Therefore, Randstad is entitled to punitive damages against Defendants to deter such improper conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Randstad prays that this Court:

Enter judgment in Plaintiff's favor and against Defendants, jointly and severally, where applicable, for all damages that may be calculated that Plaintiff may recover as a result of Defendants' misconduct, including, without limitation, compensatory and exemplary or punitive damages in an amount to proven at trial;

Enter an Order requiring Luma to make available for inspection and imaging any computers, personal data devices, e-mail accounts, online storage, or electronic storage devices owned by, assigned to, or otherwise in his possession at any time from January 1, 2018 to the present;

Enter an Order granting a preliminary and permanent injunction ordering that:

(1) Defendants, along with their agents, employers, employees, attorneys and those persons in active concert or participation with them, be enjoined through a preliminary and permanent injunction from violating their obligations under the Agreement, tortiously interfering with Plaintiff's contractual relations, or using or disclosing Plaintiff's trade secrets and confidential information; and

(2) Defendants account for all misuses of Plaintiff's trade secrets and other Confidential Information and refrain from using the Plaintiff's Confidential Information; and

(3) Defendants identify to Plaintiff any and all Randstad Customers, Talent, and employees whom Luma, or anyone acting on his behalf, has solicited or otherwise contacted since his resignation from Plaintiff, including the name of the Customer, Talent, or employee, the date of the contact, and the method of communication; and

(4) Defendants preserve and refrain from any spoliation of evidence;

Award attorneys' fees, costs and expenses as allowed by law and pursuant to the Agreement which requires Luma to indemnify the Plaintiff for such fees, costs and expenses resulting from Plaintiff's enforcement of the Agreement; and

Grant such other and further relief as may be just and proper.

**JURY TRIAL DEMAND**

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE.**

*//Robert C. Stevens*
Robert C. Stevens (Georgia Bar No. 680142)
bstevens@seyfarth.com
Alex Meier (Georgia Bar No. 282350)
ameier@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3962
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Counsel for Plaintiff Randstad Technologies, LLC*

Dated: August 30, 2018

# EXHIBIT A

randstad

Professionals

**Employee Non-Competition and Confidentiality Agreement**
*(Not for use in California)*

This Employee Non-Competition and Confidentiality Agreement (this "Agreement") is made and entered into by and between Jeff Luna ("Employee") and Randstad Technologies, LP, a Delaware limited partnership, with its principal place of business in Atlanta, Georgia (hereinafter the "Company").

WHEREAS, the Company desires to employ or continue employing Employee and to provide Employee with valuable training and access to the Company's Confidential Information and Trade Secrets; and the Employee desires such employment, training and access.

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, Employee and the Company agree as follows:

1. **At-Will Employment**. The Employee acknowledges that the Employee's employment with the Company is at-will and not for any prescribed term, meaning either party may terminate Employee's employment at any time, for any reason (except those reasons prohibited by law), with or without notice and with or without cause. The Employee's entitlement to compensation ends when the Employee's employment terminates for any reason. The parties acknowledge that Employee's duties, compensation, title and responsibilities may change over time; notwithstanding any such changes, the Employee will continue to have access to the Company's Confidential Information and Trade Secrets and this Agreement, unless modified in writing, shall continue to apply and be valid.

2. **Definitions**. For the purposes of this Agreement, the following definitions shall apply:

(a) "Business of the Company" means the services provided by the Company, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, solutions services or other services that are the same as or substantially similar to the services Employee provided on behalf of the Company within two (2) years prior to the date of Employee's separation from the Company.

(b) "Confidential Information" means data and information belonging to the Company (i) relating to the Business of the Company, (ii) which has been disclosed to the Employee or of which the Employee became aware as a consequence of or through Employee's relationship with the Company, (iii) which has value to the Company, and (iv) which is not generally known to the public or the Company's competitors. Without limiting the generality of the foregoing, "Confidential Information" includes the Company's proprietary processes and methods of operation, pricing, margin and mark-up information, strategic plans, training techniques and manuals, recruitment and placement strategies and targets, financial data and projections, sales and marketing information, personnel information, information concerning Placement Candidates and Talent (such as employment preferences, salary requirements/history, contact information, availability, customer feedback and interpersonal skills), and information concerning actual or prospective customers (such as hiring preferences, staffing needs, hiring manager contact information, pricing and job orders). Notwithstanding anything herein to the contrary, the term "Confidential Information" shall not be interpreted to include or mean any data or information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by the Employee without authorization from the Company), or that has been independently developed and disclosed by others, or that enters the public domain through lawful means.

(c) "Material Contact" means any contact between Employee and a customer, Placement Candidate or Talent (i) with whom or which Employee dealt on behalf of the Company; (ii) whose dealings with the Company were coordinated or supervised by the Employee; (iii) about whom Employee obtained Confidential Information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in

compensation, commissions, or earnings for the Company within two (2) years prior to the Employee's separation from employment with the Company.

(d) "Personal Information" consists of a person's first and last name (or first initial and last name), plus one or more of the following: (i) Social Security number; (ii) driver's license number or state-issued identification card number; (iii) bank account or other financial account number; (iv) credit or debit card number; or (v) (where provided by law) the person's e-mail address.

(e) "Placement Candidate" means (i) any person who was identified by the Company for placement on an assignment with a customer as of the date of Employee's separation of employment with the Company or (ii) any person who completed an assignment with the Company within the twenty-four (24) months prior to the date of Employee's separation of employment with the Company and is eligible to be placed on assignment with a customer again.

(f) "Restricted Territory" means the following geographic territory to the maximum extent determined to be reasonable by a court of competent jurisdiction:

(i) a radius of twenty-five (25) miles of any office(s) to which Employee was assigned or which Employee managed, during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(ii) a radius of twenty-five (25) miles of any office(s) in which Employee performed services on behalf of the Company at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(iii) a radius of twenty-five (25) miles of any office(s) in which the Company employed personnel whom Employee directly or indirectly supervised or managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and

(iv) any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company.

(g) "Talent" means any employee who is placed by the Company on an assignment with a customer as of the date of Employee's separation of employment with the Company.

(h) "Trade Secrets" means Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar applicable law.

3. **Entrustment and Preservation of Confidential Information and Trade Secrets.**

(a) The Employee acknowledges that Confidential Information and Trade Secrets are valuable, special and unique assets of the Company's business. In the course of Employee's employment with the Company, the Company will disclose to Employee and grant Employee access to Confidential Information and Trade Secrets, and Employee desires to be, and will be, entrusted with such Confidential Information and Trade Secrets during employment by the Company. In consideration of the Company's entrusting to the Employee certain of its Confidential Information and Trade Secrets, the Employee shall not directly or indirectly reproduce, use, distribute, disclose, publish, or misappropriate any Confidential Information or Trade Secrets on behalf of Employee or any person or entity other than the Company for any purpose whatsoever (i) at any time during Employee's employment with the Company, and (ii) after Employee's separation from employment with the Company (for any reason) for so long as the information in question meets the definition of Confidential Information set forth in Section 2(b), up to a maximum of two (2) years from the date of such separation of employment; provided that as to any Confidential Information that constitutes a Trade Secret under applicable law, these restrictions shall apply for so long as the

information remains a Trade Secret. The Employee acknowledges that any such prohibited use or disclosure of Confidential Information or Trade Secrets is likely to cause irreparable harm and financial loss to the Company.

(b) Unless done for and on behalf of the Company during Employee's employment by the Company, Employee will never use or disclose any person's Personal Information which Employee may learn or acquire at any time during employment with the Company. Furthermore, Employee shall at all times take appropriate measures to protect against the loss of, or damage to, Personal Information in the Employee's possession or control.

4. **Restrictive Covenants**. The Employee acknowledges that the Company has expended substantial amounts of money, time and effort in developing and maintaining its extensive personnel resources, Confidential Information, Trade Secrets, goodwill and relationships with customers, Placement Candidates, Talent and associate (internal) employees. Consequently, the Employee shall devote his or her best efforts, attention and energies to the Company's business at all times during his or her employment. Furthermore, in consideration of the Company's initial and continuing employment of the Employee, the Company's provision to the Employee of initial and ongoing training regarding the Company's business, and the Company's entrustment to the Employee of the Company's Confidential Information and Trade Secrets (without such training and entrustment of Confidential Information and Trade Secrets Employee acknowledges that he or she could not perform his or her job duties and responsibilities), the Employee agrees as follows:

(a) During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or entity other than the Company:

(i) contact, solicit, service, sell to, or attempt to contact, solicit, service, or sell to any customer of the Company with whom Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;

(ii) contact, solicit, service, place, or attempt to contact, solicit, service, or place any Placement Candidate or Talent with whom the Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;

(iii) contact, recruit, or solicit, or attempt to contact, recruit, or solicit any associate (internal) employee of the Company with whom the Employee worked at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for the purpose of encouraging, enticing or causing such associate (internal) employee to terminate employment with the Company, or to accept employment with any person or entity that competes with the Business of the Company; or

(iv) hire any associate (internal) employee of the Company with whom the Employee worked at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for any person or entity that competes with the Business of the Company.

(b) During his or her period of employment with the Company, Employee shall not, directly or indirectly, engage in (or own more than a five (5) percent interest in any entity which engages in) activities or services competitive with the Business of the Company.

(c) During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, operate, control, or own

any entity which engages in activities competitive with the Business of the Company (other than owning, as a passive investment, no more than a five (5) percent interest in any such entity).

(d) During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, on Employee's own behalf or on behalf of any person or entity other than the Company, hold any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company if such position involves:

(i) providing products or services competitive with the Business of the Company;

(ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company;

(iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or

(iv) engaging in responsibilities in which Employee would utilize or disclose Confidential Information.

(e) Within seven (7) days of the separation (for any reason) of Employee's employment with the Company, Employee shall delete social media connections, including LinkedIn connections, with any (i) customer of the Company with whom Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and (ii) Placement Candidates or Talent with whom the Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company.

5. **<u>Disclosure and Assignment of Inventions</u>**. All discoveries, inventions, processes, designs, plans, writings, creations, programs, product improvements, materials, Confidential Information, and Trade Secrets ("Work Made for Hire") whether of a technical nature or not, made or developed by Employee alone or in conjunction with any other person or entity during the course of Employee's employment with the Company, which relate to or affect the business of the Company, shall be the sole and exclusive property of the Company. Employee shall disclose and release all such Work Made for Hire and all information regarding the same to the Company concurrent with the discovery or development of the same. Employee shall and hereby does assign all rights, title, and interest in any such Work Made for Hire to the Company. Employee shall not use or disclose the Company's Work Made for Hire to benefit a person or business that competes with the Company, a customer of the Company, an individual or other entity (except in performing his or her obligations to the Company during his or her employment with the Company), without the express, written permission of the Company. Employee hereby irrevocably assigns any such Work Made for Hire to the Company and shall execute and deliver promptly to the Company such assignments and other written instruments, and to do such other acts as may be required to patent, copyright or otherwise protect such Work Made for Hire and to invest the entire right, title and interest in such Work Made for Hire in the Company.

6. **<u>Return of Company Documents and Equipment</u>**. The Employee acknowledges that all originals, copies and summaries of manuals, memoranda, notes, notebooks, records, reports, plans, computer-based data in any form, tabulations or compilations, and other documents or items of any kind concerning any matters affecting or relating to the present or potential business of the Company, whether or not they contain Confidential Information or Trade Secrets, and all Company-owned equipment which may be provided for Employee's use while employed by the Company, are and shall continue to be the property of the Company. The Employee shall return to the Company all such documents and equipment in the possession or under the control of the Employee immediately upon the date of Employee's separation of employment with the Company or sooner if requested by the Company.

7. **Freedom to Contract**. The Employee represents to the Company that he or she has the legal right to enter into this Agreement without violating any other employment agreement or consulting arrangement, including any non-competition, non-solicitation or confidentiality agreements (collectively, "Other Contracts"), and that he or she will not become subject to any Other Contracts in conflict with this Agreement during the Employee's employment with the Company. Employee further represents that he or she will not upload to the Company's systems, disclose to the Company, or use for the Company's benefit any trade secrets or confidential information which is the property of any prior employer or other third party. If Employee fails to disclose or breaches any Other Contracts, the Company may incur significant legal exposure and expenses. Accordingly, in the event of any such failure to disclose or breach of Other Contracts, the Company reserves the right to terminate Employee's employment and to seek all available legal remedies in connection with the breach of the representations set forth in this Section.

8. **Enforcement and Damages**. The Employee acknowledges that the Company will suffer irreparable injury and damage and cannot be reasonably or adequately compensated in monetary damages alone for the loss by the Company of its benefits or rights under this Agreement as the result of a breach, default or violation by the Employee of any of his or her obligations under this Agreement. Accordingly, the Company shall be entitled, in addition to all other remedies which may be available to it (including monetary damages), to injunctive and other available equitable relief in any court of competent jurisdiction in Cobb County, Georgia to prevent or otherwise restrain or terminate any actual or threatened breach, default or violation by the Employee of any provision of this Agreement or to enforce any such provision. The Company will not be required to post any bond as a condition of the Company receiving such injunctive relief, and the Employee hereby specifically waives the right to request or require the posting of a bond as a condition of the Company receiving injunctive relief. The Employee shall reimburse the Company for all reasonable legal fees and costs incurred by the Company in connection with bringing a successful action to enforce this Agreement.

9. **Compliance with Policies/Procedure for Complaints**. The Employee shall comply with all applicable Company policies of which he or she has been made aware, including but not limited to those policies found in the Employee Handbook published on the Human Resources Department's page of Randstad Connect (https://www.randstadconnect.com/sites/HR). In addition, the Employee shall at all times act in conformity with the Company's Business Principles (http://www.randstad.com/corporate-governance/our-principles/business-principles), and the Employee acknowledges that he or she has been apprised of the Company's Misconduct Reporting Procedure (see link within Business Principles). In the event that a complaint is warranted under the Misconduct Reporting Procedure, the Employee may call 1-866-250-6706 or visit www.speakupfeedback.eu/web/integrityatrandstad/us. In connection with either reporting mechanism, the access code is 42115. The Employee acknowledges that by this Agreement, the Employee has been notified that if he or she has any questions or concerns about his or her employment, the Company's policies or principles, or if the Employee has a complaint of any kind concerning his or her employment, that the Employee has the right and is encouraged to notify his or her Human Resources (HR) Business Partner.

10. **Miscellaneous**.

(a) The Employee acknowledges that his or her obligations under this Agreement are personal and that he or she may not assign any of his or her rights or delegate any of his or her duties or obligations under this Agreement. The Company may assign, without notice to the Employee, its rights and obligations under this Agreement, which shall inure to the benefit of, and shall be binding upon, the successors and assigns of the Company.

(b) If, after executing this Agreement, Employee: (i) is promoted to, assigned to or otherwise assumes one or more positions or functions other than or in addition to Employee's position or functions at the time Employee signed this Agreement, regardless of title, or (ii) is transferred or assigned to or otherwise works for any affiliate, subsidiary or other division or business unit of the Company, the terms of this Agreement shall continue to apply with full force and effect.

(c) The Employee acknowledges that the covenants contained in Sections 3 and 4 are reasonable and essential to protect the Company's Confidential Information, Trade Secrets, goodwill and its relationships with customers, Placement Candidates, Talent and associate (internal) employees, and that such covenants will not impair the Employee's ability to procure subsequent comparable employment.

(d) This Agreement may be executed in two or more counterparts, all of which together shall constitute a single agreement. A copy, .pdf/.jpg or facsimile shall be treated as an original Agreement for all purposes.

(e) Each of the covenants and provisions contained in this Agreement is severable and shall be enforceable independently of every other provision. In the event that any provision of this Agreement shall be held to be overly broad in any respect (including, without limitation as to scope, geographic applicability, time period, activity or subject) so as to be unenforceable as written and agreed to by the parties, it is the parties' intention that such provision shall be construed by the appropriate court or arbitrator by limiting or reducing it so as to be enforceable to the fullest extent compatible with the then applicable law, and the parties hereby specifically request that any such court or arbitrator exercise its discretion consistent with this intention.

(f) If Employee previously executed other written agreements with the Company relating to the subject matter of this Agreement, and/or if Employee later enters into other written agreements that contain provisions similar to the provisions contained in this Agreement, all such provisions shall be interpreted to provide the Company with cumulative rights and remedies, and the benefits and protections provided to the Company under each such agreement shall be given full force and effect. No prior or contemporaneous agreement, whether written or oral, shall be construed to change, amend, alter, repeal or invalidate this Agreement.

(g) A waiver by one party of a breach of this Agreement by the other party shall not be construed as a waiver of any subsequent or similar breach.

(h) This Agreement may be amended or terminated only by written agreement of both parties.

(i) Nothing in this Agreement shall relieve Employee of any duties or obligations Employee has to the Company under statutory or common law, which include but are not limited to: fiduciary duties, the duty of loyalty, the duty not to tortiously interfere with business relationships, the duty not to engage in unfair competition, and the duty not to misappropriate any Trade Secrets.

(j) Employee acknowledges that the Company provided Employee with a copy of this Agreement prior to or concurrent with making an offer of employment, or an offer of change in Employee's job classification, or implementation of a merit increase or other change in the Employee's compensation and benefits, and informed Employee, prior to Employee's execution of this Agreement, that this Agreement is required as a condition of employment with the Company.

11. **<u>Agreement Comprehension and Legal Advice</u>**. The Employee represents that he or she has read this Agreement completely and carefully and that he or she understands the contents and effect of this Agreement. Employee further represents that he or she has had the opportunity to consult with an attorney before voluntarily signing below and has either consulted with an attorney or waived the opportunity to do so.

12. **<u>Governing Law and Selection of Forum</u>**. This Agreement and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the laws of the state of Georgia, without giving effect to provisions thereof regarding conflict of laws. Any claims arising out of or related to the covenants in Sections 3, 4, 5, and 6 of this Agreement, all claims arising under applicable law governing trade secrets, and all claims for emergency injunctive relief, must be litigated exclusively in the Superior or State Courts of Cobb County, Georgia, provided, however, that any such claim or cause of action may be brought in, or removed to, the United States District Court for the Northern District of Georgia, Atlanta Division, to the extent that such court would have jurisdiction over the subject matter of such action. The Employee and the Company waive any objection

based on personal jurisdiction and forum non conveniens and waive any objection to venue of any action instituted hereunder to the extent that an action is brought in the courts identified above. Each party agrees that a final judgment in any such action shall be conclusive and may be enforced in any other jurisdiction in any manner provided by law.

**IN WITNESS WHEREOF,** the parties have signed this agreement as of this 23 day of June, 2015.

**Employee:**

______________________
(Signature)

Jeff Luna
(Print Name)

**Randstad Technologies, LP:**

By: ______________________

Angela Harris SVP NO
(Print Name and Title)

ID# 2018-0123160-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
J. Stephen Schuster - 48
AUG 30, 2018 04:56 PM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER 18106542

$224.00 COST PAID

Randstad Technologies, LLC

**PLAINTIFF**

**VS.**

Collabera Inc.
Luma, Jeffrey

**DEFENDANTS**

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**1075 Peachtree Street, N.E.**
**Suite 2500**
**Atlanta, Georgia 30309**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 31st day of August, 2018.**

Clerk of Superior Court

COBB COUNTY Georgia 1833 SUPERIOR COURT CLERK

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

ID# 2018-0123161-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
J. Stephen Schuster - 48
AUG 30, 2018 04:56 PM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER 18106542

$224.00 COST PAID

Randstad Technologies, LLC

**PLAINTIFF**

**VS.**

Collabera Inc.
Luma, Jeffrey

**DEFENDANTS**

## SUMMONS

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**1075 Peachtree Street, N.E.**
**Suite 2500**
**Atlanta, Georgia 30309**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 31st day of August, 2018.**

Clerk of Superior Court

COBB COUNTY Georgia 1833 SUPERIOR COURT CLERK

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

ID# 2018-0123162-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
J. Stephen Schuster - 48
AUG 30, 2018 04:56 PM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

# General Civil and Domestic Relations Case Filing Information Form

☑ **Superior or** ☐ **State Court of** Cobb **County**

**For Clerk Use Only**

**Date Filed** 08-30-2018 **Case Number** 18106542
**MM-DD-YYYY**

| **Plaintiff(s)** | **Defendant(s)** |
|---|---|
| Randstad Technologies, LLC | Collabera Inc. |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | Luma, Jeffrey |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |

**Plaintiff's Attorney** ______________ **Bar Number** ______________ **Self-Represented** ☑

**Check One Case Type in One Box**

**General Civil Cases**

- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Automobile Tort
- ☐ General Tort
- ☑ Contract
- ☐ Real Property
- ☐ Civil Appeal
- ☐ Habeas Corpus
- ☐ Restraining Petition
- ☐ Injunction/Mandamus/Other Writ
- ☐ Garnishment
- ☐ Landlord/Tenant
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Adoption
- ☐ Family Violence Petition
- ☐ Other Domestic Relations

**Post-Judgement – Check One Case Type**

- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony.
- ☐ Modification
- ☐ Administrative/Other

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all the same parties, subject matter, or factual issues. If so, provide a case number for each.

______________ **Case Number** ______________ **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. §9-11-7.1.

☐ Is interpreter needed in this case? If so, provide the language(s) required. ______________
**Language(s) Needed**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

ID# 2018-0123163-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
J. Stephen Schuster - 48
AUG 30, 2018 04:56 PM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

DISCLOSURE STATEMENT
CLERK OF SUPERIOR COURT

CASE NUMBER **18106542**

**Randstad Technologies, LLC**
Plaintiff

Vs.

**Collabera Inc.; Luma, Jeffrey**
Defendant

TYPE OF ACTION

- o Divorce without Agreement Attached
- o Divorce with Agreement Attached
- o Domestic Relations
- ✔ Damages Arising out of Contract
- o Damages Arising out of Tort
- o Condemnation
- o Equity
- o Zoning – County Ordinance Violations (i.e., Injunctive Relief-Zoning)
- o Zoning Appeals (denovo)
- o Appeal, Including denovo appeal – excluding Zoning
- o URESA
- o Name Change
- o Other
- o Recusal
- o Adoption

PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court (Whether pending simultaneously or not)?

✔ NO
o YES – If yes, please fill out the following:

1. Case # ____________________
2. Parties ____________________
3. Assigned Judge _____________
4. Is this case still pending? o Yes o No
5. Brief description of similarities:

/S/ **Stevens, Robert**
Attorney or Party Filing Suit

ID# 2018-0123221-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
AUG 31, 2018 09:35 AM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. 18106542** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY**
**AND ORDER TO PRESERVE EVIDENCE**

Plaintiff Randstad Technologies, LLC ("Randstad"), by and through its attorneys, and pursuant to O.C.G.A. §§ 34(b)(1-2) and Rule 6.7 of the Uniform Superior Court Rules, moves this Court to enter an order granting the following relief: (1) authorizing Randstad to conduct limited, expedited discovery focused on identifying Randstad's property in the possession of Defendants Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma) (collectively, "Defendants"); and (2) requiring Defendants to preserve evidence in advance of a hearing on Randstad's impending request for a preliminary injunction.[1]

Randstad's Motion is based on the accompanying Memorandum of Law and Randstad's Motion for Temporary Restraining Order, Memorandum of Law in Support, and all attached exhibits. Based on the extensive evidence of Defendants' unlawful violations of their nondisclosure obligations owed to Randstad, Randstad requests that the Court grant its motion and enter an order finding that good cause exists to authorize limited expedited discovery, requiring

[1] Randstad will contemporaneously provide copies of its filings to Defendants by email, in addition to service by overnight mail.

Defendants to respond to Randstad's written discovery requests and produce responsive documents within 14 days of service, directing that general discovery shall commence immediately, and ordering that the submission of any motion to dismiss shall not operate as a stay of discovery. A proposed order is attached for the Court's convenience.

Respectfully submitted,

*//Robert C. Stevens*

Robert C. Stevens (Georgia Bar No. 680142)
bstevens@seyfarth.com
Alex Meier (Georgia Bar No. 282350)
ameier@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3962
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Counsel for Plaintiff Randstad Technologies, LLC*

Dated: August 31, 2018

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. 18106542** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on August 31, 2018, he caused copies of the foregoing Plaintiff's Motion for Expedited Discovery to be served on Jeffrey Luma by email and mail (overnight delivery specified) and on Collabera Inc. by mail (overnight delivery specified) at the following addresses:

Jeffrey Luma
Jluma29@yahoo.com
66 Upper Prospect Road
Atlantic Highlands, NJ 07716

Collabera, Inc.
c/o Blumberg Excelsior Corp.
2000 Riverside Parkway #885
Atlanta, GA 30328

// *Robert C. Stevens*______________
Robert C. Stevens
Ga. Bar. No. 680142

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. 18106542** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY AND ORDER TO PRESERVE EVIDENCE**

Plaintiff Randstad Technologies, LLC ("Randstad"), by and through its attorneys, and pursuant to O.C.G.A. §§ 34(b)(1-2) and Rule 6.7 of the Uniform Superior Court Rules, moves this Court to enter an order allowing: (1) Randstad to conduct limited, expedited discovery focused on identifying the Randstad property in the possession of Randstad's former employees, Defendants Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma) (collectively, "Defendants"); and (2) requiring Defendants to preserve evidence in advance of a hearing on Randstad's impending request for a preliminary injunction.[1]

## INTRODUCTION AND FACTUAL SUMMARY

This is a trade secrets and restrictive covenant case. As described in detail in Randstad's Motion for Temporary Restraining Order ("TRO"), Defendants J Defendants Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma) have unlawfully violated their nondisclosure obligations owed to Randstad. Accordingly, Randstad requests that the Court authorize the immediate

[1] Randstad has provided copies of its filings to Defendants by email, in addition to service by mail.

commencement of discovery, limited expedited discovery, and order Defendants to preserve and not destroy evidence relevant to this dispute.

## ARGUMENT

The Georgia Civil Practice Act permits the Court to alter the default timing of discovery. O.C.G.A. § 9-11-34(b)(1-2), § 9-11-33(a)(2). "A court may allow expedited discovery upon a showing of good cause." *Merial LLC v. Fidopharm, Inc.*, No. 1:13-CV-1207-SCJ, 2013 WL 12072140, at *2 (N.D. Ga. May 22, 2013) (granting expedited discovery in conjunction with a motion for preliminary injunction). In assessing good cause, courts commonly consider the following factors:

> (1) whether a motion for preliminary injunction is pending; (2) the breadth of the requested discovery; (3) the reason(s) for requesting expedited discovery; (4) the burden on the opponent to comply with the request for discovery; and (5) how far in advance of the typical discovery process the request is made.

*Thyssenkrupp Elevator Corp. v. Hubbard*, Civ. No. 2:13-cv-202-FTM-29SPC, 2013 WL 1953346, at *1 (M.D. Fla. May 10, 2013).

Here, each of the relevant factors are in favor of granting Randstad's request for expedited discovery. First, Randstad's Motion for TRO is pending, which Randstad anticipates will be followed shortly thereafter by a motion for preliminary injunction. Second, as evidenced by the proposed order attached hereto, the breath of Randstad's requested discovery is narrowly tailored to a limited date-range of only a few weeks. The requests are further focused on specifically identifying Randstad's property and confidential information that Defendants likely possess and to prevent Defendants from destroying that information.

Third, it is imperative that Randstad be permitted to immediately issue discovery focused on identifying the specific Randstad property that remains in Defendants' possession and to ensure that evidence is preserved. Without this expedited discovery, there is a substantial likelihood that Randstad's trade secrets and/or confidential information will be disclosed, which would undoubtedly result in irreparable harm. *See, e.g., Novelis Corp. v. Smith*, No. 1:16-CV-1557-ODE, 2017 WL 1745635, at *8 (N.D. Ga. Mar. 10, 2017) (disclosure of trade secrets or confidential information would result in irreparable harm); *Sci. Games Int'l, Inc. v. Cash*, No. 2:16-CV-00142-WCO, 2017 WL 542034, at *6 (N.D. Ga. Jan. 25, 2017) (holding that the "threat of improperly using confidential information may constitute an irreparable harm"). Accordingly, Randstad should not be forced to endure more than two months of irreparable harm in order for discovery to proceed in the usual course.

Fourth, Defendants' burden to respond to the expedited discovery requests would be minimal, absent widespread violations of or interference with Randstad's agreements. If Defendants complied with their nondisclosure obligations, they should not have used any Randstad property for any purpose unrelated to their employment with Randstad. Other categories of requested documents and information are either easily retrievable, such as phone and text records, or almost entirely date-limited to a one-month period.

In sum, Randstad requests that the Court grant its motion and enter an order finding that good cause exists to authorize limited expedited discovery, requiring Defendants to respond to Randstad's written discovery requests and produce responsive documents within 14 days of service, and directing that general discovery shall commence immediately. A proposed order is attached for the Court's convenience.

Respectfully submitted,

*//Robert C. Stevens*

Robert C. Stevens (Georgia Bar No. 680142)
bstevens@seyfarth.com
Alex Meier (Georgia Bar No. 282350)
ameier@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3962
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Counsel for Plaintiff Randstad Technologies, LLC*

Dated: August 31, 2018

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. 18106542** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on August 31, 2018, he caused copies of the foregoing Plaintiff's Motion for Expedited Discovery to be served on Jeffrey Luma by email and mail (overnight delivery specified) and on Collabera Inc. by mail (overnight delivery specified) at the following addresses:

Jeffrey Luma
Jluma29@yahoo.com
66 Upper Prospect Road
Atlantic Highlands, NJ 07716

Collabera, Inc.
c/o Blumberg Excelsior Corp.
2000 Riverside Parkway #885
Atlanta, GA 30328

*// Robert C. Stevens*______________
Robert C. Stevens
Ga. Bar. No. 680142

ID# 2018-0123259-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
AUG 31, 2018 10:19 AM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. 18106542** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER WITH ACCOMPANYING MEMORANDUM**

Plaintiff Randstad Technologies, LLC ("Randstad"), by its attorneys and pursuant to O.C.G.A. § 9-11-65, hereby moves this Court for a Temporary Restraining Order ("TRO") against Defendants Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma") (together, "Defendants").

## I. INTRODUCTION

This case presents a quintessential example of why Georgia companies like Randstad need reasonable restrictive covenants to protect them from unfair competition by former senior executives, and why this Court has the power to enjoin violations of such covenants. To that end, this emergency request for TRO arises from the wrongful conduct of Collabera, a direct competitor of Cobb County, Georgia-based Randstad, in unlawfully hiring Luma, the former Region President East of Randstad, as Collabera's new Chief Strategy Officer ("CSO"). This activity clearly violates Luma's Agreement with Randstad, an agreement that

both federal and state courts in Georgia have previously found to be valid and enforceable. (*See* Orders Granting TRO, attached as **Exhibit 1** and **Exhibit 2**.)

As set forth in the affidavits and other evidence submitted to the Court with this Motion,[1] until his sudden and unexpected resignation on July 26, 2018, Luma was responsible for developing sales strategy and managing sales execution for all of Randstad's businesses lines along the east coast. Accordingly, as a top executive at Randstad, Luma had nearly unfettered access to Randstad's trade secrets and was personally responsible for developing and executing Randstad's most confidential business and sales strategies.

Not surprisingly, Luma is subject to a narrowly-tailored twelve month non-compete covenant in his written employment agreement with Randstad. Yet despite his Agreement, Luma abruptly notified Randstad of his resignation on July 26, 2018, and has accepted employment with Collabera,[2] a direct competitor of Randstad, in blatant breach of the non-compete covenant. He is now directly competing against Randstad as Collabera's CSO, armed with detailed knowledge of Randstad's most confidential business and sales plans and strategies.

In light of Luma's employment with Collabera, Randstad filed this action to prevent the immediate irreparable harm that it faces from Defendants' unfair competition. Although Randstad has demanded that the Defendants honor Luma's obligations to Randstad in his employment agreement, Defendants have refused to do so. Accordingly, unless this Court

[1] The following affidavits are attached to this Motion: Affidavit of Graig Paglieri ("Paglieri Aff.") (attached as **Exhibit 3**), and Affidavit of Richard Brown ("Brown Aff.") (attached as **Exhibit 4**).

[2] Collabera maintains principal places of business in Basking Ridge, New Jersey.

immediately enjoins Defendants, Luma will continue to compete against Randstad in violation of his agreement and armed with the incalculably invaluable confidential information that he possesses through his employment with Randstad. Randstad, therefore, seeks this TRO to preserve the status quo pending a hearing on Randstad's anticipated application for a preliminary injunction against Defendants.

## II. FACTUAL BACKGROUND

### A. Randstad's Business, Trade Secrets, and Other Confidential Information

Randstad, based in Cobb County, Georgia, is a leader in the highly-competitive and specialized staffing business. (Paglieri Aff. ¶ 3.) Randstad and its affiliates provide individual employees ("Talent") to a diverse portfolio of businesses and organizations ("Customers") nationwide on a temporary or permanent basis to meet the Customers' needs. (*Id.* ¶ 3.) Randstad Technologies specializes in information technology ("IT") positions in a variety of industries. (*Id.* ¶ 3.)

The staffing industry is a highly competitive, specialized business that is relationship-driven between customers, Talent, and the sales force. (Paglieri Aff. ¶ 4.) Through decades of hard work, dedication, innovation and investment, Randstad has become a leader in the staffing industry. (*Id.* ¶ 4.) Randstad's success in the highly competitive staffing industry is directly dependent on its staffing teams' Customer and institutional knowledge and Randstad's ability to provide top quality Talent to its Customers, and top quality job placements to its Talent. (Paglieri Aff. ¶ 5.) Accordingly, Randstad provides its employees -- and particularly those in senior leadership positions -- with extensive access to its trade secrets and other confidential and proprietary information, including, without limitation,

information relating to Randstad's business and sales strategies, finances, methodologies, processes, operations, pricing, Customers, Talent and employees ("Confidential Information"). (*Id.* ¶ 6.)

Because such Confidential Information is critical to Randstad's competitive position in the staffing industry, Randstad takes reasonable efforts to maintain its confidentiality, including requiring employees with access to such information to sign confidentiality agreements, using password protected computers and password protected log-ins to Randstad's databases, and maintaining various written policies to protect its trade secrets and other confidential and/or proprietary information. (Paglieri Aff. ¶¶ 6-8.) For example, Randstad maintains an Access Policy which provides that computer systems used by employees are "the private property of Randstad" and are "for authorized use only." (Brown Aff. ¶ 11 and Ex. 1.) All users of Randstad-issued computers automatically receive the text of the policy when they power on their computer, and users must click an "OK" button agreeing to the policy's terms before logging into the computer. (*Id*.) In addition, Randstad maintains a Company Property and Resources Policy that it promulgates in its Employee Handbook. (Brown Aff. ¶ 12 and Ex. 2.) Among other provisions, that policy provides that "[c]onfidential, proprietary and trade secret information and trade service marks of the Company are the exclusive property of Randstad and may not be used and/or disclosed outside the company without express written consent of the legal department." (*Id.*)

Randstad takes such measures to protect its Confidential Information because, if Randstad's Confidential Information were to fall into the hands of a competitor, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on

many years' worth of valuable accumulated knowledge. (Paglieri Aff. ¶ 9.) Likewise, if a former employee retained Plaintiff's Confidential Information after his employment ended, Randstad's competitive position would be seriously harmed and the competitor would have an unfair competitive advantage. (*Id.*)

**B. Luma's Employment with Plaintiff.**

Luma joined Randstad as an account manager in 2004, selling Randstad's services to clients based in New Jersey, New York, and eastern Pennsylvania. (Paglieri Aff. ¶ 10.) In 2005, Luma was promoted to Managing Director. (*Id.*) In that role, he had full profit and loss (P&L) responsibility for and oversight of Randstad's Edison, New Jersey branch. (*Id.*) In 2009, Luma was again promoted, this time to Regional Managing Director. (*Id.*) In that role, he had full P&L responsibility for both of Randstad's New Jersey offices. (*Id.*) In 2010, Luma's territory was expanded to include additional offices in the New York/New Jersey market. (*Id.*) In 2013, Luma was again promoted, this time to Vice President of National Strategic Sales. (*Id.*) In this role, he was responsible for managing Randstad's sales strategies for the entire northern half of the United States for Randstad's National Strategic Organization. (*Id.*) This role also entailed the development and management of Randstad's sales strategies with regard to many of Randstad's largest clients. (*Id.*)

Finally, in 2018, Luma was promoted to Region President East, in which he was responsible for developing sales strategy and managing sales execution for all lines of business for Randstad's Eastern Region. (Paglieri Aff. ¶ 11.) In that role, Luma was responsible for developing sales strategy and managing sales execution for all lines of business for Randstad's Eastern Region. (*Id.*) He had full P&L responsibility for an

organization that has approximately $600 million in revenue and approximately 200 employees, including eight direct reports. (*Id.*)

### C. Luma's Detailed Knowledge of Randstad's Most Sensitive Trade Secrets and Other Confidential Information.

Not surprisingly, Luma gained highly detailed knowledge of and had access to Randstad's Confidential Information. (Paglieri Aff. ¶ 11.) Indeed, as a top executive at Randstad, Luma was not only privy to Randstad's Confidential Information but was personally responsible for developing and executing Randstad's most confidential business and sales strategies. (*Id.*)

Specifically, on a regular basis during his tenure as Region President East for Randstad and continuing until the day of his resignation, Luma received, reviewed, and, in many cases, prepared documents containing Randstad's most confidential business strategies and other sensitive business information. (Paglieri Aff. ¶¶ 10-16.) Such Confidential Information included, but was not limited to, (a) Randstad's digital strategy, (b) marketing strategies, (c) growth strategies and methodologies, (d) plans for business and service concepts under development by Randstad, (e) identification of large Customers and prospects, (f) pricing offered to large Customers and prospects, (g) sales pitches and proposals, (h) sales strategies generally and with specific Customers, and (i) field steering (i.e., Randstad's expectations for individual branch offices on a daily basis). (Paglieri Aff. ¶ 12.) In fact, right up to the day of his resignation from Randstad, Luma not only had access to such confidential business and sales strategies but was intimately involved in developing and implementing such strategies. (Paglieri Aff. ¶ 13.)

Luma had access to multiple pricing and strategy documents during his employment that contain highly confidential information about Randstad's margin and pricing that, if used by a competitor, would allow the competitor to undercut Randstad's pricing. (Paglieri Aff. ¶ 14.) In addition, they provide confidential data about Randstad's conversion rates, profitability, and other key performance metrics. (*Id.*) If obtained by a competitor, such information would allow a competitor to replicate Randstad's business plans and strategies and potentially challenge Randstad's market position. (*Id.*)

These are only examples of the extremely sensitive Confidential Information to which Luma had access while at Randstad. (Paglieri Aff. ¶ 15.) As a senior executive, he was regularly included in highly confidential meetings with other senior leaders in which the Company's long-term and short-term strategies were discussed. (*Id.*)

In short, the information to which Luma had access as Region President East constitutes the essence of Randstad's business and sales plans and strategies and the precise DNA for the services Randstad provides to its customers. (Paglieri Aff. ¶ 16.) It is precisely the type of information that a competitor would need to replicate Randstad's business and sales strategies in the staffing industry and, thereby, displace Randstad's market position. (*Id.*)

**D. Luma's Obligations to Randstad under the Executive Non-Competition and Confidentiality Agreement.**

In light of Randstad's protectable interests (including its Customer goodwill and the extensive Confidential Information that Luma obtained through his employment with Randstad), Luma entered into an Executive Non-Competition and Confidentiality Agreement ("Agreement") with Randstad on June 23, 2015. (Paglieri Aff. ¶ 17 and Ex. 1.)

Among other provisions, the Agreement contains a non-disclosure provision, as well as a narrowly-tailored, twelve-month non-compete covenant stating as follows:

> During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, on Employee's own behalf or on behalf of any person or entity other than the Company, hold any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company [defined as "the services provided by the Company, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, payrolling, recruitment process outsourcing, independent contractor assessment and placement, HR and management consulting, managed services, or other services that are the same as or substantially similar to the services Employee provided on behalf of the Company within two (2) years prior to the date of Employee's separation from the Company"] if such position involves:
>
> (i) providing products or services competitive with the Business of the Company;
>
> (ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company;
>
> (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or
>
> (iv) engaging in responsibilities in which Employee would utilize or disclose Confidential Information.

(Paglieri Aff. Ex. 1, at § 4(d).)[3]

---

[3] The term "Restricted Territory" is defined in the Agreement as "the following geographic territory to the maximum extent determined to be reasonable by a court of competent jurisdiction:

> (i) a radius of twenty-five (25) miles of any office(s) to which Employee was assigned or which Employee managed, during the twelve (12) months

In addition, the Agreement authorizes injunctive relief and other available equitable relief from this Court to prevent any actual or threatened breach, default or violation of the Agreement by Luma, as follows:

> The Employee acknowledges that the Company will suffer irreparable injury and damage and cannot be reasonably or adequately compensated in monetary damages alone for the loss by the Company of its benefits or rights under this Agreement as the result of a breach, default or violation by the Employee of any of his or her obligations under this Agreement. Accordingly, the Company shall be entitled, in addition to all other remedies which may be available to it (including monetary damages), to injunctive and other available equitable relief in any court of competent jurisdiction in Cobb County, Georgia to prevent or otherwise restrain or terminate any actual or threatened breach, default or violation by the Employee of any provision of this Agreement or to enforce any such provision. The Company will not be required to post any bond as a condition of the Company receiving such injunctive relief, and the Employee hereby specifically waives the right to request or require the posting of a bond as a condition of the Company receiving injunctive relief. The Employee shall reimburse the Company for all reasonable legal fees and costs incurred by the Company in connection with bringing a successful action to enforce this Agreement.

(Paglieri Aff. Ex. 1, at § 8.)

---

prior to the date of Employee's separation of employment with the Company;

(ii) a radius of twenty-five (25) mils of any office(s) in which Employee performed services on behalf of the Company at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(iii) a radius of twenty-five (25) mils of any office(s) in which the Company employed personnel whom Employee directly or indirectly supervised or managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and

(iv) any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company."

(Paglieri Aff. Ex 1, at § 2(f).)

### E. Luma's Abrupt Resignation from Randstad and Employment with Collabera in Breach of the Agreement.

On July 26, 2018, Luma suddenly notified Randstad that he would resign his employment with Randstad, and he later informed Randstad that he accepted a leadership position with Collabera. (Paglieri Aff. ¶ 18.) Upon information and belief, Luma is currently employed as Chief Strategy Officer at Collabera. (*Id.*)

Collabera is a direct competitor of Randstad and is among the top 10 largest IT staffing firms in the United States. (Paglieri Aff. ¶¶ 18-22.) Randstad provides the same services and competes in the same space. (*Id.*) Indeed, for the past several years, Collabera has attempted to recruit several Randstad senior executives, including Mr. Luma, and including for the CSO role. (Paglieri Aff. ¶ 24.) In light of Luma's employment with Collabera, Randstad immediately filed this action to prevent the immediate irreparable harm that it faces from Defendants' unfair competition.

As CSO of Collabera, Luma's responsibilities will include the same duties that he held for Randstad with respect to the same types of services in the staffing industry. (Paglieri Aff. ¶ 19.) Such employment is a blatant violation of Section 4(d) of the Agreement, which expressly prohibits Luma from, among other activities, (i) "providing products or services competitive with the Business of the Company,"[4] (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company,"

[4] The Agreement defines "Business of the Company" as "the services provided by the Company, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, payrolling, recruitment process outsourcing, independent contractor assessment and placement, HR and management consulting, managed services, or other services that are the same as or substantially similar to the services Employee provided on behalf of the Company within two (2) years prior to the date of Employee's separation from the Company." (*See* Paglieri Aff. Ex. 1 at § 2(a).)

(iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information." (Paglieri Aff. Ex. 1, at § 4(d).)

## III. ARGUMENT

The purpose of a TRO pursuant to O.C.G.A. § 9-11-65 is to preserve the status quo while a case is pending. *Grossi Consulting, LLC v. Sterling Currency Grp.*, 290 Ga. 386, 388, 722 S.E.2d 44, 46 (2012). A party may obtain entry of a TRO if it can show the court: (1) it has a likelihood of ultimate success on the merits of its underlying claim; (2) there is a substantial threat it will suffer immediate and irreparable injury that has no adequate remedy at law if the injunction is denied; (3) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; and (4) granting the interlocutory injunction will not disserve the public interest. *Mitchell v. DeKalb Cty. Bank*, 139 Ga. App. 562, 228 S.E.2d 746, 747 (1976); *SRB Inv. Servs., LLP v. Branch Banking Tr.* Co., 289 Ga. 1, 5 , 709 S.E. 2d 267, 271 (Ga. 2011).

Randstad seeks a TRO for Luma's breach of his contractual obligations to Randstad and Collabera's tortious interference with Randstad's contractual relations with Luma. As explained below, Randstad is entitled to the injunctive relief it seeks because: (a) Randstad has more than a sufficient likelihood of success on the merits of its claims; (b) Randstad faces the prospect of immediate irreparable injury for which Randstad has no adequate remedy at law if Defendants are not immediately enjoined; (c) the threatened injury to Randstad far outweighs any threatened harm to Defendants if the TRO is issued; and (d)

granting the TRO will not disserve the public interest. Accordingly, Randstad is entitled to a TRO immediately enjoining Defendants as set out in the [Proposed] Temporary Restraining Order enclosed with this Motion.

### A. Randstad Has a More Than Reasonable Likelihood of Success on the Merits.

#### 1. Randstad is Substantially Likely to Prevail on its Claim for Breach of Contract.

Randstad is substantially likely to prevail on its breach of contract claim against Luma because the non-compete and non-disclosure covenants are demonstrably valid and enforceable under Georgia's restrictive covenants statute, O.C.G.A. §§ 13-8-50 to 59, which governs the Agreement, and Luma is in blatant breach of these covenants.[5] In enacting the restrictive covenants statute, the General Assembly expressly found that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50. Here, the covenants in the Agreement are precisely the types of covenants that the General Assembly authorized to protect Georgia businesses like Randstad from unfair competition.

##### a. The Agreement is Valid and Enforceable.

The Agreement prohibits Luma from, among other things, engaging, for one year after his separation from Randstad, in activities competitive with Randstad, including (i)

[5] Georgia's restrictive covenants statute applies to all restrictive covenants executed on or after the effective date of the statute, May 11, 2011. *In re Pervis*, 512 B.R. 348, 373 (Bankr. N.D. Ga. 2014)

"providing products or services competitive with the Business of the Company [as defined in the Agreement]," (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company," (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information."[6] (Paglieri Aff. Ex. 1, § 4(d)(i)-(iv).) This covenant is demonstrably enforceable under Georgia law, which upholds restraints on competition are enforceable as long as the restrictions protect legitimate business interests and are reasonably limited in time, geographic area, and scope of the prohibited activities. *See* O.C.G.A. § 13-8-53(a); *Cellairis Franchise, Inc. v. Duarte*, No. 2:15-cv-00101-WCO, 2015 WL 6517487, at *5 (N.D. Ga. Oct. 21, 2015); *CSM Bakery Solutions, LLC v. Debus*, Case No. 1:16-cv-03732-TCB, 2017 WL 2903354, at *2 (N.D. Ga. Jan. 25, 2017). The non-compete covenant at issue meets all of these requirements.

First, Randstad has numerous legitimate business interests for which the restrictions in the non-compete are reasonably necessary. As noted above, as a top executive at Randstad, Luma not only had nearly unfettered access to Randstad's trade secrets but was personally responsible for developing and executing Randstad's most confidential business

[6] The Agreement also has a non-disclosure covenant prohibiting Luma from reproducing, using, disclosing or misappropriating Randstad's Confidential Information for two years after his employment with Randstad, and from disclosing or misappropriating Randstad's trade secrets for as long as the information remains a trade secret under applicable law. (Paglieri Aff. Ex. 1, § 3(a).) Georgia law allows for the protection of confidential information or trade secrets so long as the information remains confidential or continues to be trade secret. *See* O.C.G.A. § 13-8-53(e). Accordingly, like the non-compete covenant, the non-disclosure covenant is valid and enforceable.

and sales strategies. (*See* Paglieri Aff. ¶¶ 10-16.) Protection of such trade secrets and other valuable Confidential Information is a legitimate business interest under Georgia law and is precisely why Randstad requires senior executives like Luma to execute non-compete covenants. *See* O.C.G.A. § 13-8-51(9) (listing trade secrets and "valuable confidential information that otherwise does not qualify as a trade secret" as legitimate business interests under Georgia law).

Second, as to time, a restraint of two years or less against a former employee is presumed to be reasonable under the statute. O.C.G.A. § 13-8-57(b); *Debus*, 2017 WL 2903354, at *1 (one year non-compete is reasonable). Accordingly, the one-year restriction on competition in the Luma Agreement is well within the statutory presumption for reasonableness.

Third, as to geography, the statute does not require any detailed description but provides that fair notice of the maximum reasonable scope of the restraint is sufficient. *Id.* at § 13-8-53(c)(1). As provided in the statute:

> Whenever a description of activities, products, or services, or geographic areas, is required by this Code section, any description that provides fair notice of the maximum reasonable scope of the restraint shall satisfy such requirement, even if the description is generalized or could possibly be stated more narrowly to exclude extraneous matters. In case of a post-employment covenant entered into prior to termination, any good faith estimate of the activities, products, or services, or geographic areas, that may be applicable at the time of termination shall also satisfy such requirement, even if such estimate is capable of including or ultimately proves to include extraneous activities, products, or services, or geographic areas. The post-employment covenant shall be construed ultimately to cover only so much of such estimate as relates to the activities actually conducted, the products or services actually offered, or the geographic areas actually involved within a reasonable period of time prior to termination.

*Id.* Thus, a geographic territory "which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable provided that . . . the total distance encompassed by the provisions of the covenant also is reasonable." *Id.* at § 13-8-56(2); *Duarte*, 2015 WL 6517487, at *6; *Novelis Corp. v. Smith*, No. 1:16-cv-1557-ODE, 2017 WL 1745635, at *6 (N.D. Ga. 2017).

Here, the limited definition of the "Restricted Area," among other things,[7] reflects "the geographic areas actually involved" and is reasonable because Randstad does business globally and Luma was responsible for Randstad's business and sales plans and strategies in the Eastern portion of the United States. *See* O.C.G.A. §§ 13-8-53(c)(1), 13-8-56(2). Indeed, non-compete covenants without any geographic restriction have been found to be reasonable under Georgia law where the entity seeking to enforce the covenant was a global company. *See Novelis*, 2017 WL 1745635, at *7 (finding that non-compete provision lacking any geographic restriction was reasonable because "Novelis' business is global, involving customers and facilities across the globe, and sales within and between four global regions."). Here, of course, the Restricted Territory is defined even more narrowly and specifically tied to Luma's work on behalf of Randstad.

[7] As noted above, the term "Restricted Territory" is defined in the Agreement to mean the "geographic territory to the maximum extent determined to be reasonable by a court of competent jurisdiction" of "a radius of twenty-five (25) miles from any office(s)" where "Employee was assigned or which Employee managed" or "Employee performed services on behalf of the Company" or "in which the Company employed personnel whom Employee directly or indirectly supervised or managed" during the 12 months "prior to the date of Employee's separation of employment with the Company." (Paglieri Aff. Ex. 1, ¶ 2(f).) The term "Restrict Territory" is also defined to include "any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company." (*Id.*)

Fourth, as to the scope of prohibited activities, the statute provides that phrases such as "of the type conducted, authorized, offered, or provided . . . or similar language" shall be sufficient. O.C.G.A. § 13-8-53(c)(1). According to the statue, the scope of a restriction is measured by the business of the employer or other person or entity in whose favor the restrictive covenant is given. *Id.* at § 13-8-56(3).

Here, the Agreement prohibits Luma from providing to a competitor like Collabera the same or substantially similar services that he provided to Randstad, including "(i) "providing products or services competitive with the Business of the Company [as defined in the Agreement]," (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company," (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information." (Paglieri Aff. Ex. 1, § 4(d)(i)-(iv).) These restricted activities track "the activities actually conducted" by Luma at the time of his resignation and are set forth with considerably more specificity than required by the statute. These are reasonable limitations under the statute. O.C.G.A. §§ 13-8-53(c)(1), 13-8-56(3). Accordingly, the non-competition provision Agreement in this case is valid and enforceable under Georgia law.

**b. Luma is Violating and/or Imminently Threatening to Violate the Agreement.**

There can be no serious dispute that Luma's employment as CSO of Collabera is a blatant breach of the twelve-month non-competition provision in the Agreement. In late July or early August 2018, Luma abruptly resigned from his employment with Randstad and

joined Collabera, which is a direct competitor of Randstad in the IT staffing industry. (Paglieri Aff. ¶ 18.) He is now employed with Collabera as its CSO and will be performing the same or substantially similar duties he performed for Randstad with respect to the "Business of the Company," which the Agreement defines as including "temporary, temporary to hire, direct hire and outsourced placement and staffing services, . . . or other services that are the same as or substantially similar to the services [Luma] provided on behalf of the Company within two (2) years prior to the date of [Luma]'s separation from the Company." (*Id.*; *see also* (Paglieri Aff. Ex. 1, § 2(a).) It is hard to imagine a more clear-cut violation of the non-compete covenant in the Agreement. Accordingly, Randstad is substantially likely to prevail on its breach of contract claim against Luma.[8]

[8] While Luma's clear violation of the non-compete covenant is alone sufficient to warrant a TRO in this case, Luma's employment with Collabera in a role in which he will inevitably make use of his intimate knowledge of Randstad's trade secrets and other Confidential Information is also a breach or threatened breach of the non-disclosure provision in the Agreement, as well as a threatened misappropriation of trade secrets in violation of the Georgia Trade Secrets Act ("GTSA"). Given the nature of Luma's position at Randstad as compared to his new position at Collabera, this Court need not entertain the fiction that Luma can somehow compete directly against Randstad without making use of the substantial volume of trade secrets and other Confidential Information with which he is intimately familiar (and particularly the confidential business plans for the next 12 months that he himself developed for Randstad only a few weeks ago). Common sense demonstrates that no person, no matter how well-intentioned, could avoid using such inside information while performing the same duties for a direct competitor. As such, Defendants' imminent threat to use and/or disclose the information at issue (including Randstad's confidential business strategies) constitutes both a breach of the nondisclosure covenant and a threatened misappropriation of trade secrets that this Court can and should immediately enjoin. *See, e.g.*, *Essex Group v. Southwire Co.*, 269 Ga. 553, 555, 501 S.E. 2d 501 (1998) (holding that plaintiff's confidential logistics system was trade secret and that threatened misappropriation of trade secret warranted issuance of permanent injunction against defendant); *Scientific Games Int'l, Inc. v. Cash*, No. 2:16-cv-00142-WCO, 2017 WL 542034, at *5 (N.D. Ga. Jan. 25, 2017) (defendant's knowledge of company's trade secrets coupled with conduct of downloading company's files weighed in support of enjoining future or threatened misappropriation); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010)

### 2. Randstad Is Substantially Likely to Prevail on Its Claim for Tortious Interference with Contractual Relations.

Randstad is also likely to succeed on its claim for tortious interference with contractual relations. Randstad can establish a *prima facie* case of tortious interference by showing that Collabera: (1) acted improperly without privilege; (2) acted purposely and with malice or intent to injure; (3) induced Luma to breach his contractual obligations to Randstad; and (4) caused Randstad injury. *Tribeca Homes, LLC v. Marathon Inv. Corp.,* 322 Ga. App. 596, 598-599, 745 S.E.2d 806, 808-09 (Ga. Ct. App. 2013). Regarding the first element, "privilege" means "a legitimate or bona fide interest of the defendant or a legitimate relationship of the defendant with the contract, which causes the defendant not to be considered a stranger, interloper, or meddler to the contract." *Carey Station Village Home Ownwers Ass'n, Inc. v. Carey Station Village, Inc.*, 268 Ga. App. 461, 462, 602 S.E.2d 233, 235 (Ga. Ct. App. 2004). Regarding the second element, "[t]he term 'malicious' . . . , is to be given a liberal meaning" such that "[t]he act is malicious when the thing done is with the knowledge of the plaintiff's rights, and with the intent to interfere therewith." *Architectural Mfg. Co. v. Airotec, Inc.*, 119 Ga. App. 245, 251, 166 S.E.2d 744, 747-48 (Ga. Ct. App. 1969).

At this stage, Randstad has shown a sufficient likelihood of ultimately satisfying its burden of demonstrating these elements. As explained above, Randstad and Luma are parties to an Agreement which, among other things, prevents Luma, for one (1) year after the

---

(enjoining the defendant from working for the plaintiff's competitor after the evidence demonstrated that the defendant had access to a significant number of trade secrets); *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir. 1995) (enjoining the defendant based on the inevitable disclosure doctrine because the defendant "could not be trusted.").

termination of his employment with Randstad, from working for a competitor of Randstad in a competing capacity. Yet despite its actual knowledge of this Agreement, Collabera interfered with Randstad's contractual relationship with Luma when it induced Luma to accept employment with Collabera in a competitive role in violation of the Agreement. Such actions are a textbook example of tortious interference. Indeed, Georgia courts have consistently held that unauthorized interference with enforceable non-compete agreements or other contractual relationships are actionable. *See Carroll Anesthesia Associates, P.C. v. AnestheCare, Inc.,* 234 Ga. App. 646, 648, 507 S.E.2d 829, 832 (Ga. Ct. App. 1998) (finding interference with noncompete covenant actionable and stating that [p]ersuading a person to break a contract for the … purpose of … benefitting the defendant at the expense of the plaintiff is a malicious and actionable act if injury arises from it"); *Witty v. McNeal Agency, Inc.*, 239 Ga. App. 554, 561, 521 S.E.2d 619, 628, (Ga. Ct. App. 1999) (affirming judgment for former employer on tortious interference claim against competitor where former employee breached restrictive covenants in employment agreement with aiding, abetting, and urging of competitor).

### B. Randstad Faces the Prospect of Immediate Irreparable Injury for which it has no Adequate Remedy at Law if Defendants are not Immediately Enjoined

Randstad faces the prospect of serious and irreparable harm if Defendants are permitted to continue their unlawful acts. Indeed, Georgia appellate courts have long authorized injunctive relief as an appropriate remedy to enforce restrictive covenants. *See, e.g., Poe & Brown of Ga., Inc. v. Gill*, 268 Ga. 749, 750, 492 S.E. 2d 864 (1997) (abuse of

discretion to deny injunctive relief on grounds that Plaintiff had adequate remedy at law where evidence showed defendant violating restrictive covenant).

This situation is no different. Although discovery will be needed to develop a fuller picture of Defendants' improper activities to date, Luma's breach of the Agreement, with the active assistance of Collabera, cannot seriously be disputed. The Court need only review the affidavits submitted by Randstad, including Graig Paglieri's explanation of the highly sensitive business and sales plans and strategies with which Luma has intimate knowledge (*see, e.g.*, Paglieri Aff. ¶¶ 10-16), to appreciate the seriousness of the threat that Defendants pose to Randstad through Luma's breach of the Agreement. Preventing him from being able to take that knowledge to the competitor is the precise reason why Randstad requires senior executives like Luma to sign non-compete covenants.

At this early juncture, there is no way to calculate the damages that will result to Randstad's business if Luma is permitted to continue to be employed as CSO of Collabera in direct competition with Randstad while armed with the most sensitive business and sales plans of Randstad. As one federal appellate court has recognized, an injury is "irreparable" if it "cannot be undone through monetary damages." *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). There simply is no way to compensate Randstad with monetary damages for the damage that would befall Randstad if Defendants are able to unlawfully use Randstad's trade secrets and other Confidential Information to unfairly compete against Randstad. Accordingly, this Court should not wait for Defendants to achieve their objective but should immediate enjoin them now.

### C. The Threatened Injury to Randstad Far Outweighs Any Threatened Harm to Defendants if the TRO is Issued

The balance of hardships also decidedly tips in Randstad's favor. If Defendants are not enjoined from their unlawful conduct, Randstad faces the very real prospect of irreparable harm to its goodwill and permanent loss of the trade secrets and other Confidential Information that it entrusted to Luma. To date, Defendants have given no indication whatsoever that they intend to honor Luma's Agreement. To the contrary, Luma has confirmed that he is currently employment with Collabera as its CSO. Thus, the only way to prevent irreparable harm and maintain the status quo is through the immediate entry of a temporary restraining order.

In contrast, granting injunctive relief to Randstad will merely prevent Defendants from engaging in actions that they are already legally and contractually prohibited from performing. Collabera will not be precluded from continuing to compete against Randstad generally. Luma, an experienced senior executive, will not be prohibited from being gainfully employed in a senior executive role. Indeed, he will even remain free to work for Collabera -- a large company with multiple business operations throughout the United States -- in a capacity that does not violate the terms of the non-compete and non-disclosure covenants in his Agreement. Given this reality, the hardships that Randstad will face if injunctive relief is not granted vastly outweigh whatever hardships Defendants will face simply by complying with their existing legal obligations.

**D. The TRO will not Disserve the Public Interest**

Finally, the public interest will not be disserved by granting Randstad's request for injunctive relief. As one federal court in this state has observed

> Georgia favors enforcing reasonable restrictive covenants. "[R]easonable restrictive covenants ... serve the legitimate purpose of protecting legitimate

> business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." Ga. Code Ann. § 13-8-50. Legitimate business interests include inter alia trade secrets, confidential information, substantial relationships with customers and vendors, good will, and specialized training. Ga. Code Ann. § 13-8-51(9). . . . Finally, [the employer] is headquartered in Georgia, has significant investments in Georgia, and employs a substantial number of people in Georgia. Public policy thus favors granting the injunction requested here.

*Novelis*, 2017 WL 1745635. *See also Variable Annuity Life Ins. Co. v. Joiner*, 454 F. Supp. 2d 1297, 1305 (S.D. Ga. 2006) (granting preliminary injunction enforcing restrictive covenants in employment agreement).

This Court should adopt the same reasoning in this action. No public interest will be disserved if the Court grants Randstad's motion for injunctive relief. On the contrary, issuance of a TRO will vindicate this State's public policy in favor of ensuring fair competition and enforcing valid contracts. It will also protect the legitimate business interests of Randstad, a company headquartered in Georgia that has significant investments in Georgia and employs a substantial number of people in Georgia.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Randstad has shown a likelihood of success on the merits of its claims and that it faces the prospect of immediate irreparable injury for which it has no adequate remedy at law if Defendants are not immediately enjoined.

WHEREFORE, Randstad respectfully prays that this Court enter a Temporary Restraining Order ordering Defendants, including their agents, representatives, employees, and/or anyone else active in concert or participation with them who receives notice of the Order by personal service or otherwise, as follows:

- Enjoining Defendants from directly or indirectly accessing, using, disclosing, disseminating or making available Plaintiff's trade secrets or its confidential and/or proprietary information to any person or entity other than Plaintiff;

- Enjoining Luma from working for Defendant Collabera Inc. or from otherwise, directly or indirectly, on Luma's own behalf or on behalf of any person or entity other than Plaintiff, holding any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the business of Plaintiff in violation of the terms of the Agreement;

- Ordering Luma to comply with all provisions of the Agreement relating to non-solicitation of Plaintiff's customers and employees and non-disclosure of Plaintiff's trade secrets, confidential and/or proprietary information;

- Ordering Luma to deliver (within 7 business days of entry of this Order) to the offices of Plaintiff's counsel, Seyfarth Shaw LLP, located at 1075 Peachtree Street, Suite 2500, Atlanta, Georgia 30309: (i) any computer devices or electronic storage media or devices in his possession, custody, or control that currently or previously contained any of Plaintiff's trade secrets or other confidential proprietary information, and (ii) any other property of Plaintiff, in any format, in his possession, custody or control;

- Ordering Luma to identify (within 7 business days of entry of this Order) any and all Randstad customers, placement candidates, and employees whom Luma, or anyone acting on his behalf, has solicited or otherwise contacted since July 31, 2018, including: (a) the date(s) and time(s) the contact occurred; (b) the name of the person(s) contacted; (c) the method(s) of communication; and (d) a description of what was discussed; and

- Ordering Defendants to immediately preserve all data and information in their possession, custody, or control, of any type and however maintained, pertaining to Plaintiff's business or the allegations set forth in Plaintiff's Complaint in this action, including, but not limited to, data and information in an electronic format.

No prior application for the relief requested herein has been made to this or any other Court. For the Court's convenience, a Proposed Order is enclosed with this Motion.

Respectfully submitted,

*//Robert C. Stevens*

Robert C. Stevens (Georgia Bar No. 680142)
bstevens@seyfarth.com
Alex Meier (Georgia Bar No. 282350)
ameier@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3962
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Counsel for Plaintiff Randstad Technologies, LLC*

Dated: August 31, 2018

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. 18106542** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on August 31, 2018, he caused copies of the foregoing Plaintiff's Emergency Motion for Temporary Restraining Order to be served on Jeffrey Luma by email and mail (overnight delivery specified) and on Collabera Inc. by mail (overnight delivery specified) at the following addresses:

Jeffrey Luma
Jluma29@yahoo.com
66 Upper Prospect Road
Atlantic Highlands, NJ 07716

Collabera, Inc.
c/o Blumberg Excelsior Corp.
2000 Riverside Parkway #885
Atlanta, GA 30328

*// Robert C. Stevens*___________
Robert C. Stevens
Ga. Bar. No. 680142

# EXHIBIT 1

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **RANDSTAD GENERAL PARTNER (US), LLC,** **Plaintiff,** | **CIVIL ACTION** |
| v. | **FILE NO. 17108166** |
| **VOLT WORKFORCE SOLUTIONS, INC. and LINDA PERNEAU,** **Defendants.** | |

**[PROPOSED] TEMPORARY RESTRAINING ORDER AND RULE NISI**

On November 13, 2017, Plaintiff Randstad General Partner (US), LLC ("Plaintiff" or "Randstad") filed a Motion for Temporary Restraining Order (the "Motion"). The Motion is supported by Randstad's Memorandum of Law, as well as the supporting affidavits of Kenneth Johnson, Greg Dyer, and Brenda Richard. The Court heard oral arguments on Randstad' Motion on __________, 2017 (the "Hearing"). Defendants were provided advance notice of the Hearing and given the opportunity to attend.

The Court believes immediate consideration is appropriate in light of the evidence presented. After considering all evidence, it appears to the Court from the specific facts shown that Plaintiff has met the standards applicable to the award of a temporary restraining order. See Garden Hills Civic Ass'n v. MARTA, 539 S.E.2d 811, 812-13 (Ga. 2000).

IT IS HEREBY ORDERED THAT, pursuant to O.C.G.A. § 9-11-65, from the date of entry of this Order and until the 30th day after its entry, unless sooner dissolved by this Court, Defendants, including their agents, representatives, employees, and/or anyone else active in concert or participation with them who receives notice of this Order by personal service or otherwise, are hereby ordered as follows:

FILED IN COURT
THIS 11/14 20 17
AT 2:54 P. M
REBECCA KEATON
CLERK SUPERIOR COURT
COBB COUNTY, GEORGIA

1. Defendant~~s are~~ Perneau is enjoined from directly or indirectly accessing, using, disclosing, disseminating or making available Plaintiff's trade secrets or its confidential and/or proprietary information to any person or entity other than Plaintiff;

2. Defendant Perneau is enjoined from working for Defendant Volt Workforce Solutions, Inc. or from otherwise, directly or indirectly, on Perneau's own behalf or on behalf of any person or entity other than Plaintiff, holding any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the business of Plaintiff in violation of the terms of the Executive Non-Competition and Confidentiality Agreement (the "Agreement") attached to this Order as Exhibit A;

3. Defendant Perneau shall comply with all provisions of the Agreement relating to non-solicitation of Plaintiff's customers and employees and non-disclosure of Plaintiff's trade secrets, confidential and/or proprietary information;

4. Defendant Perneau shall deliver (within 7 business days of entry of this Order) to an agreed third-party neutral ~~the offices of Plaintiff's counsel, Seyfarth Shaw LLP, located at 1075 Peachtree Street, Suite 2500, Atlanta, Georgia 30309~~: (i) any computer devices or electronic storage media or devices in her possession, custody, or control that currently or previously contained any of Plaintiff's trade secrets or other confidential or proprietary information, and (ii) any other property of Plaintiff, in any format, in her possession, custody or control;

5. Defendant Perneau shall identify (within 7 business days of entry of this Order) any and all Randstad customers, placement candidates, and employees whom Perneau, or anyone acting on her behalf, has solicited or otherwise contacted since October 25, 2017, including: (a) the date(s) and time(s) the contact occurred; (b) the name of the person(s) contacted; (c) the method(s) of communication; and (d) a description of what was discussed; and

6. ~~Defendants~~ Parties shall immediately preserve all data and information in their possession, custody, or control, of any type and however maintained, pertaining to Plaintiff's business or the allegations set forth in Plaintiff's Complaint in this action, including, but not limited to, data and information in an electronic format.

7. Plaintiff's Motion for Preliminary Injunction shall be heard by this Court on December __, 2017 at _______ a.m./p.m. in Courtroom __.

8. Plaintiff shall serve this Order on Defendants.

IT IS SO ORDERED, this 14th day of Nov, 2017, at 2:55 ~~a.m.~~/p.m.

Judge, Superior Court of Cobb County

GEORGE H. KREEGER
SENIOR JUDGE, STATE OF GEORGIA
PRESIDING IN COBB JU[illegible]



42025696v.1

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| RANDSTAD PROFESSIONALS US, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH TAMBERRINO, ERIC HOWSER, and BRYAN WATTS,<br><br>Defendants. | ) | CASE NO. 1:18-cv-00940-ELR |

**CONSENT ORDER FOR PRELIMINARY INJUNCTION**

On March 8, 2018, Plaintiff Randstad Professionals US, LLC filed its Complaint against Defendants Joseph Tamberrino, Eric Howser, and Bryan Watts. Randstad alleges that Defendants, in the course of leaving Randstad and establishing a competitive business, Veritas Partners, LLC, violated the Defend Trade Secrets Act of 2016 ("DTSA") and their common-law obligations to Randstad. Randstad also alleges that Defendants Howser and Watts breached various restrictive covenants in their employment agreements and that Defendant Tamberrino tortiously interfered with those agreements by facilitating violations of various restrictive covenants. This matter is now before the Court on the parties' Consent Order for Preliminary Injunction as to Defendants Howser and Watts.

Defendants Howser and Watts consent to the entry of this order and state that their consent is given knowingly and voluntarily and that they have had the opportunity to, and have in fact, consulted with their counsel prior to consenting to the relief described in this order.

**THE PARTIES AGREE AND THE COURT FINDS THAT:**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, and personal jurisdiction and venue over the parties in this action are also present.

2. Randstad and Defendants have stipulated and agreed to the entry of this preliminary injunction order without a finding by the Court of law or fact other than stated below. Randstad stipulates that it will not seek to recover its attorneys' fees and costs solely as a result of the entry of this preliminary injunction.

3. Howser is a former Randstad Executive Recruiter.

4. Watts is a former Randstad Executive Recruiter.

5. Tamberrino is a former Randstad National Director to whom Howser and Watts reported.

6. Randstad is an industry leader in the staffing industry, a highly competitive, specialized business built on customer relationships and decades of institutional knowledge and competitive intelligence.

7. Randstad has legitimate, protectable business interests in its relationships with its customers, Talent, and employees.

8. To enable its employees to perform their duties, Randstad provides employees, including Defendants, with access to relevant Confidential Information and trade secrets, such as pricing, customer preferences and hiring needs, branch management, comprehensive financial data, and similar information or compilations of information that derives economic value because it is not generally known.

9. Randstad takes reasonable measures and precautions to protect its Confidential Information and trade secrets, because Randstad has expended substantial amounts of money, time, and effort in developing and maintaining such information.

10. Randstad has legitimate, protectable business interests in its Confidential Information and trade secrets.

11. Howser signed an employment agreement with Randstad on or about July 11, 2016.

12. Watts signed an employment agreement with Randstad on or about February 1, 2016.

Case 1:18-cv-00940-ELR Document 23 Filed 03/28/18 Page 4 of 16

13. Section 3 of Howser's and Watts' employment agreements describe their obligations to protect Randstad's Confidential Information and trade secrets. Specifically, Section 3 includes the following restrictions:

> (a) [Howser/Watts] acknowledges that Confidential Information and Trade Secrets are valuable, special and unique assets of the Company's business. In the course of [Howser's/Watts's] employment with the Company, the Company will disclose to Employee and grant Employee access to Confidential Information and Trade Secrets, and Employee desires to be, and will be, entrusted with such Confidential Information and Trade Secrets during employment by the Company. In consideration of the Company's entrusting to [Howser/Watts] certain of its Confidential Information and Trade Secrets, [Howser/Watts] shall not directly or indirectly reproduce, use, distribute, disclose, publish, or misappropriate any Confidential Information or Trade Secrets on behalf of [Howser/Watts] or any person or entity other than the Company for any purpose whatsoever (i) at any time during [Howser's/Watts's] employment with the Company, and (ii) after [Howser's/Watts's] separation from employment with the Company (for any reason) for so long as the information in question meets the definition of Confidential Information set forth in Section 2(b), up to a maximum of two (2) years from the date of such separation of employment; provided that as to any Confidential Information that constitutes a Trade Secret under applicable law, these restrictions shall apply for so long as the information remains a Trade Secret. [Howser/Watts] acknowledges that any such prohibited use or disclosure of Confidential Information or Trade Secrets is likely to cause irreparable harm and financial loss to the Company.

14. Defendants agree that Section 3 is a valid and enforceable contractual expression of Randstad's legitimate business interests in protecting its Confidential Information and trade secrets.

15. Section 4 of Howser's and Watts' employment agreements contain restrictive covenants that limit their ability to compete with Randstad and to solicit Randstad's customers, Talent, and employees. Specifically, Section 4 includes the following restrictions:

> (a) During [Howser's/Watts's] employment with the Company and the eighteen (18) month period immediately following the date of [Howser's/Watts's] separation of employment with the Company, regardless of the reason for such separation, [Howser/Watts] shall not, directly or indirectly, on [Howser's/Watts's] own behalf or on behalf of any person or entity other than the Company:
>
> > (i) contact, solicit, service, sell to, or attempt to contact, solicit, service, or sell to any customer of the Company with whom [Howser/Watts] had Material Contact at any time during the twelve (12) months prior to the date of [Howser's/Watts's] separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;
> >
> > (ii) contact, solicit, service, place, or attempt to contact, solicit, service, or place any Placement Candidate or Talent with whom [Howser/Watts] had Material Contact at any time during the twelve (12) months prior to the date of [Howser's/Watts's] separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;
> >
> > (iii) contact, recruit, or solicit, or attempt to contact, recruit, or solicit any associate (internal) employee of the Company with whom [Howser/Watts] worked at any time during the twelve (12) months prior to the date of [Howser's/Watts's] separation of employment with the Company for the purpose of encouraging, enticing or causing such associate (internal) employee to terminate employment

Case 1:18-cv-00946-ELR Document 23 Filed 03/28/18 Page 6 of 16

with the Company, or to accept employment with any person or entity that competes with the Business of the Company; or

(iv) hire any associate (internal) employee of the Company with whom [Howser/Watts] worked at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for any person or entity that competes with the Business of the Company.

(b) During his or her period of employment with the Company, [Howser/Watts] shall not, directly or indirectly, engage in (or own more than a five (5) percent interest in any entity which engages in) activities or services competitive with the Business of the Company.

(c) During [Howser's/Watts's] employment with the Company and the twelve (12) month period immediately following the date of [Howser's/Watts's] separation of employment with the Company, regardless of the reason for such separation, [Howser/Watts] shall not, within the Restricted Territory, directly or indirectly, operate, control, or own any entity which engages in activities competitive with the Business of the Company (other than owning, as a passive investment, no more than a five (5) percent interest in any such entity).

(d) During [Howser's/Watts's] employment with the Company and the twelve (12) month period immediately following the date of [Howser's/Watts's] separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, on [Howser's/Watts's] own behalf or on behalf of any person or entity other than the Company, hold any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company if such position involves:

(i) providing products or services competitive with the Business of the Company;

(ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company;

(iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or

(iv) engaging in responsibilities in which [Howser/Watts] would utilize or disclose Confidential Information.

16. Defendants agree that Section 4 is a valid and enforceable contractual expression of Randstad's legitimate business interests in protecting its Confidential Information and trade secrets, its relationships with customers, Talent, and employees, and its customer goodwill in the Baltimore, Maryland market.

17. Howser's and Watts' employment agreements define the "Restricted Territory" as follows:

(i) a radius of twenty-five (25) miles of any office(s) to which Employee was assigned or which Employee managed, during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(ii) a radius of twenty-five (25) miles of any office(s) in which Employee performed services on behalf of the Company at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(iii) a radius of twenty-five (25) miles of any office(s) in which the Company employed personnel whom Employee directly or indirectly supervised or managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and

> (iv) any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company.

18. The restrictive covenants detailed in Section 4 of Howser's and Watts' employment agreements are reasonable in time, geographic area, and the scope of the prohibited activities. Defendants acknowledge that, in connection with their employment with Randstad, they customarily and regularly solicited, on Randstad's behalf, customers and prospective customers and made sales and performed services on Randstad's behalf.

19. While employed by Randstad, Defendants worked out of Randstad's office located at 120 E. Baltimore Street, Suite 2220, Baltimore, Maryland 21202.

20. Since leaving Randstad, Howser and Watts have joined Veritas Partners, LLC, a Randstad competitor that provides products or services competitive with the Business of the Company, and which has its principal place of business within the Restricted Area, at 16511 York Road, Monkton, Maryland.

21. The parties agree that Randstad has entered into valid and enforceable agreements with Howser and Watts.

22. The parties agree that all restrictive covenant provisions contained in Howser's and Watts' employment agreements are valid and enforceable expressions of Randstad's legitimate, protectable business interests.

Case 1:18-cv-00940-ELR Document 23 Filed 03/28/18 Page 9 of 16

23. Randstad asserts that is likely to prevail in its action to enforce the restrictive covenants in Howser's and Watts' employment agreements.

24. Randstad asserts that, but for the entry of a preliminary injunction, Randstad would suffer irreparable harm to its legitimate business interests, including accrued customer goodwill, the potential dissemination of Confidential Information and trade secrets, and the loss of customer relationships, all of which cannot be remedied through monetary damages.

25. Randstad asserts that the public and private interests favor entry of a preliminary injunction and recognize that Georgia's public policy finds that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50.

26. The parties agree that Randstad need not post security in any amount in connection with the entry of this order.

27. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the parties waive the entry of any further findings of fact and conclusions of law for purposes of this order.

## I. DEFINITIONS

For purposes of this order, the following definitions apply:

28. "Business of the Company" is defined as the services provided by Randstad, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, payrolling, recruitment process outsourcing, independent contractor assessment and placement, HR and management consulting, managed services, or other services that are the same as or substantially similar to the services Defendants Watts and Howser provided on behalf of Randstad between January 3, 2016 and January 3, 2018.

29. "Confidential Information" is defined as data and information belonging to Randstad (i) relating to the Business of the Company, (ii) which has been disclosed to Defendants or of which Defendants became aware as a consequence of or through Defendants' relationship with Randstad, (iii) which has value to Randstad, and (iv) which is not generally known to the public or the Randstad's competitors. "Confidential Information" includes, but is not limited to, the Company's proprietary processes and methods of operation, pricing, margin and mark-up information, strategic plans, training techniques and manuals, recruitment and placement strategies and targets, financial data and projections, sales and marketing information, personnel information, information concerning Placement Candidates and Talent (such as employment preferences, salary

Case 1:18-cv-00940-ELR Document 23 Filed 03/28/18 Page 11 of 16

requirements/history, contact information, availability, customer feedback and interpersonal skills), and information concerning actual or prospective customers (such as hiring preferences, staffing needs, hiring manager contact information, pricing and job orders). "Confidential Information" does not include any data or information that has been voluntarily disclosed to the public by Randstad (except where such public disclosure has been made by Defendants without authorization from Randstad), or that has been independently developed and disclosed by others, or that enters the public domain through lawful means.

30. "Defendants" means and refers to Eric Howser, and Bryan Watts.

31. "Material Contact" means any contact between Howser or Watts and a customer, Placement Candidate, or Talent (i) with whom or which Employee dealt on behalf of the Company; (ii) whose dealings with the Company were coordinated or supervised by the Employee; (iii) about whom Employee obtained Confidential Information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for the Company within two (2) years prior to the Employee's separation from employment with the Company.

32. "Placement Candidate" means (i) any person who was identified by Randstad for placement on an assignment with a customer as of the date of

Defendants' separation of employment with Randstad or (ii) any person who completed an assignment with Randstad between January 3, 2016 and January 3, 2018.

33. "Randstad" means and refers to Randstad Professionals US, LLC and its parents, subsidiaries, affiliates, shareholders, officers, directors, attorneys, insurers, successors, representatives, agents, employees, predecessors, and assigns.

34. "Restricted Territory" is defined in Paragraph 16 of this order.

35. "Restricted Activity" is defined as any conduct described in Paragraph No. 14 of this order that occurs or facilitates the provision of staffing services within the Restricted Territory.

36. "Talent" means any employee who was placed by Randstad on an assignment with a customer as of January 3, 2018.

37. All other terms shall be interpreted according to their customary meaning and usage.

## II. SCOPE OF INJUNCTION

Based on the foregoing, it is therefore ordered that:

38. Howser and Watts, and all persons acting in the capacity of their agents, servants, employees, successors and assigns, and all persons acting in active concert or participation with Defendants who receive actual notice of such

order are restrained, enjoined, and prohibited, until further order of the Court, from directly or indirectly:

a. reproducing, using, distributing, disclosing, publishing, or misappropriating any of Randstad's Confidential Information or Trade Secrets.

b. contacting, soliciting, servicing, selling to, or attempting to contact, solicit, service, or sell to any customer of the Company with whom Howser or Watts had Material Contact, or about which Howser or Watts learned Confidential Information, at any time between January 3, 2017 and January 3, 2018 for the purpose of providing services competitive with the Business of the Company. This restriction is in effect from the date of the entry of this order until January 3, 2019.

c. contacting, soliciting, servicing, placing, or attempting to contact, solicit, service, or place any Placement Candidate or Talent with whom Howser or Watts had Material Contact, or about which Howser or Watts learned Confidential Information, at any time between January 3, 2017 and January 3, 2018 for the purpose of providing services competitive with the Business of the Company. This restriction is in effect from the date of the entry of this order until January 3, 2019.

d. contacting, recruiting, or soliciting, or attempting to contact, recruit, or solicit any associate (internal) employee of the Company with whom Howser or Watts worked, or about which Howser or Watts learned Confidential Information, at any time between January 3, 2017 and January 3, 2018 for the purpose of encouraging, enticing or causing such associate (internal) employee to terminate employment with the Company, or to accept employment with any person or entity that competes with the Business of the Company. This restriction is in effect from the date of the entry of this order until January 3, 2019.

e. hiring any associate (internal) employee of the Company with whom Howser or Watts worked at any time between January 3, 2017 and January 3, 2018 for any person or entity that competes with the Business of the Company. This restriction is in effect from the date of the entry of this order until January 3, 2019.

f. operating, controlling, or owning any entity which engages in activities competitive with the Business of the Company (other than owning, as a passive investment, no more than a five (5) percent interest in any such entity). This restriction is in effect from the date of the entry of this order until January 3, 2019.

g. holding any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company if such position involves (i) providing products or services competitive with the Business of the Company; (ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company; (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or (iv) engaging in responsibilities in which Howser or Watts would utilize or disclose Confidential Information. This restriction is in effect from the date of the entry of this order until January 3, 2019.

For purposes of clarity only, and without limiting this Paragraph 38(g), Howser shall not be allowed to perform any services, solicit or attempt to solicit, do any business with, or make any placements of or for, any actual or prospective customers, Placement Candidates, or Talent within the Restricted Territory in the area of Legal Recruiting, and Watts shall not be allowed to perform any services, solicit or attempt to solicit, do any business with, or make any placements of or for, any actual or prospective customers, Placement Candidates, or Talent within the Restricted Territory in the areas of Legal Recruiting, Banking, and/or Financial Services. In addition, neither Howser nor Watts shall be allowed to perform any services, solicit or attempt to solicit, do any business with, or make any placements of or for, any actual or prospective customers, Placement Candidates or Talent within the Restricted Territory who have had material contacts with either Howser or Watts, nor shall they assist or provide any information to Tamberrino or Veritas relating to any actual or prospective customers, Placement Candidates or Talent within the Restricted Territory who have had material contacts with either Howser or Watts. Nothing herein shall preclude Howser or Watts from working in an office or from their home for Veritas or any other competitor of Randstad within the Restricted Territory, as long as they fully abide by the provisions of this Consent Order by not working in their previous verticals, i.e. legal recruiting for Howser and legal

recruiting, banking, and financial services for Watts, and not soliciting or providing services to any of each other's previous customers, Placement Candidates or Talent.

## III. ADDITIONAL OBLIGATIONS AND STIPULATIONS

39. Howser and Watts each agree to execute, no later than 14 days from the date of this order, an affidavit certifying that affiant has not had any of Randstad's Confidential Information and/or trade secrets in his possession, custody, or control since January 3, 2018 or, alternatively, identifying such property and stating that he will not access any such information for purposes unrelated to the resolution of this dispute.

## IV. FORCE AND EFFECT

40. The injunctive provisions of this order shall be binding on Howser and Watts, upon any person insofar as he or she is acting in the capacity of an agent, servant, or employee of Howser and Watts, and upon any person with actual notice of this order to the extent that he or she is acting in active concert or participation with Howser or Watts.

41. This order shall remain in effect until further order of the Court, and the injunctive restrictions described in each subsection of Section II shall remain in effect according to the temporal limitation detailed in each subsection.

42. In the event this case is dismissed, the Court shall retain jurisdiction over this action to ensure compliance with this order and for all other purposes related to this action.

ON BEHALF OF RANDSTAD PROFESSIONALS US, LLC

By /s/ Erik W. Weibust

By /s/ Alex Meier
Eric Barton
Georgia Bar No. 040704
Alex Meier
Georgia Bar No. 282350
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia 30309
Telephone: (404) 885-6772
ebarton@seyfarth.com
ameier@seyfarth.com

Erik W. Weibust (admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone: 617-946-4800
Facsimile: 617-946-4801
eweibust@seyfarth.com

*Attorneys for Plaintiff*

ON BEHALF OF ERIC HOWSER AND BRYAN WATTS

By /s/ Andrew Dansicker
*With express permission*
Andrew Dansicker
Law Office of Andrew M. Dansicker, LLC
Executive Plaza II, Suite 705
11350 McCormick Road
Hunt Valley, Maryland 21031
(410) 771-5668
adansicker@dansickerlaw.com

*Attorney for Defendants*

SO ORDERED this 28th day of March, 2018

Eleanor L. Ross
Hon. Eleanor L. Ross
United States District Court
Northern District of Georgia

# EXHIBIT 3

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. ______________** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**AFFIDAVIT OF GRAIG PAGLIERI IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Graig Paglieri, declare as follows:

1. I am over 21 years of age, of sound mind, and competent to give the testimony in this Affidavit. I make this Affidavit upon my own personal knowledge and upon information provided to me by the records of Randstad Technologies, LLC ("Randstad") or information available through other employees of Randstad, except where it is expressly indicated otherwise. As to those matters stated on information and belief, I believe those matters to be true.

2. I have over 13 years of experience in the staffing industry and serve as President of the Randstad Technologies and Engineering. I make this Affidavit in support of Randstad's Emergency Motion for Temporary Restraining Order against the Defendants, Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma").

***Randstad's Business and Confidential Information***

3. Randstad is a leader in the staffing solutions industry and is based in Cobb County, Georgia, where it has its corporate headquarters and principal place of business. Randstad and its affiliates provide individual employees ("Talent") to a diverse portfolio of

businesses and organizations ("Customers") nationwide on a temporary or permanent basis to meet the Customers' needs. Randstad Technologies specializes in placing temporary employees in information technology ("IT") positions in a variety of industries.

4. The staffing industry is a highly competitive, specialized business that is relationship-driven between customers, Talent, and the sales force. Through decades of hard work, dedication, innovation and investment, Randstad has become a leader in the staffing industry.

5. Randstad's success in the highly competitive staffing industry is directly dependent on its staffing teams' Customer and institutional knowledge and Randstad's ability to provide top quality Talent to its Customers, and top quality job placements to its Talent. To that end, Randstad invests heavily in developing and maintaining Customer relationships and in attracting and retaining top employees and Talent for both its internal operations and for assignments with its Customers.

6. Randstad's employees receive substantial training, information, business contacts and other advantages that provide Randstad with a competitive advantage in the marketplace. In addition, Randstad provides its employees -- and particularly those in senior leadership positions -- with extensive access to its trade secrets and other confidential and proprietary information, including, without limitation, information relating to Randstad's business strategies, finances, methodologies, processes, operations, pricing, Customers, Talent and employees ("Confidential Information"). Such Confidential Information is critical to Randstad's competitive position in the staffing industry.

7. Randstad developed such Confidential Information at significant expense and effort over a number of years, such information is not generally available to the public or Randstad's competitors, and Randstad derives economic value from this information.

8. Randstad also takes reasonable efforts to maintain the confidentiality of such information, including having its employees with access to such information sign confidentiality agreements and using password protected computers and password protected log-ins to Randstad's databases.

9. If Randstad's Confidential Information were to fall into the hands of a competitor, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge. Likewise, if a former employee retained Plaintiff's Confidential Information after his employment ended and/or used the Confidential Information while working for a competitor, Randstad's competitive position would be seriously harmed and both the former employee and the competitor would have an unfair competitive advantage

***Luma's Employment with Randstad and Access to Randstad's Confidential Information***

10. Luma joined Randstad as an account manager in 2004, selling Randstad's services to clients based in New Jersey, New York, and eastern Pennsylvania. In 2005, Luma was promoted to Managing Director. In that role, he had full profit and loss (P&L) responsibility for and oversight of Randstad's Edison, New Jersey branch. In 2009, Luma was again promoted, this time to Regional Managing Director. In that role, he had full P&L responsibility for both of Randstad's New Jersey offices. In 2010, Luma's territory was expanded to include additional offices in the New York/New Jersey market. In 2013, Luma was again promoted, this time to Vice President of National Strategic Sales. In this role, he was responsible for managing

Randstad's sales strategies for the entire northern half of the United States for Randstad's National Strategic Organization. This role also entailed the development and management of Randstad's sales strategies with regard to many of Randstad's largest clients.

11. Finally, in 2018, Luma was promoted to Region President East, in which he was responsible for developing sales strategy and managing sales execution for all lines of business for Randstad's Eastern Region. In that role, Luma was responsible for developing sales strategy and managing sales execution for all lines of business for Randstad's Eastern Region. He had full P&L responsibility for an organization that has approximately $600 million in revenue and approximately 200 employees, including eight direct reports.

12. Through his employment with Randstad, Luma gained highly detailed knowledge of and had access to Randstad's Confidential Information. Indeed, as a top executive, Luma was not only privy to Randstad's Confidential Information but was personally responsible for developing and executing Randstad's most confidential business and sales plans and strategies.

13. For example, on a regular basis during his tenure at Randstad and continuing until the day of his resignation, Luma received, reviewed, and in many cases prepared documents containing Randstad's most confidential sales strategies and other sensitive business information. Such Confidential Information included, but was not limited to, (a) Randstad's digital strategy, (b) marketing strategies, (c) growth strategies and methodologies, (d) plans for business and service concepts under development by Randstad, (e) identification of large Customers and prospects, (f) pricing offered to large Customers and prospects, (g) sales pitches and proposals, (h) sales strategies generally and with specific Customers, and (i) field steering (i.e., Randstad's expectations for individual branch offices on a daily basis).

14. In fact, right up to the day of his resignation from Randstad, Luma not only had access to such confidential sales strategies but was intimately involved in developing and implementing such strategies on a nationwide basis with me and other senior leaders.

15. Luma had access to multiple pricing and strategy documents during his employment that contain highly confidential information that, if used by a competitor, would allow the competitor to undercut Randstad's pricing. In addition, they provide confidential data about Randstad's conversion rates, profitability, and other key performance metrics. If obtained by a competitor, such information would allow a competitor to replicate Randstad's business plans and strategies and potentially challenge Randstad's market position.

16. These are only examples of the extremely sensitive Confidential Information to which Luma had access while at Randstad. As a senior executive, he was regularly included in highly confidential meetings with other senior leaders in which the Company's long-term and short-term strategies were discussed.

17. In short, the information to which Luma had access as Region President East constitutes the essence of Randstad's business and sales plans and strategies and the precise DNA for the services Randstad provides to its customers. It is precisely the type of information that a competitor would need to replicate Randstad's business strategies in the staffing industry and, thereby, displace Randstad's market position.

18. On June 23, 2015, Luma executed Executive Non-Competition and Confidentiality Agreement with Randstad. A true and accurate copy of the Agreement is attached hereto as **Exhibit 1**.

***Luma's Abrupt Resignation from Randstad and Impending Employment with Collabera***

19. On July 26, 2018, Luma informed Randstad that he was leaving Randstad. He did not identify his future employer.

20. At the time of his resignation, Luma refused to identify his new employer to me, claiming that he could not do so for three weeks, without providing an explanation as to why.

21. During his exit interview, I reminded Luma of his ongoing contractual obligations to Randstad, including his covenant not to compete.

22. Approximately three weeks later, the week of August 20, 2018, Luma reported to me that he had accepted employment with Collabera as its Chief Strategy Officer. I understand that, Luma will be responsible in this role for developing, implementing, and managing Collabera's business and sales strategies in the IT staffing industry nationwide, including in the eastern part of the United States. If this is correct, Luma's position at Collabera appears to include the same duties that he held for Randstad with respect to the same types of services in the staffing industry.

23. As President of Randstad Technologies and Engineering, I routinely review publicly-available information about our competitors in the staffing industry so that I can identify overall industry trends and protect Randstad's market position. I am familiar with Collabera because it is one of our direct competitors in IT staffing services.

24. Within the staffing industry, Staffing Industry Analysts ("SIA") is one of the most widely-utilized authorities on trends in the industry, and Randstad relies heavily on research conducted by SIA when assessing Randstad's market position compared to that of major competitors within various market segments. Accordingly, I am familiar with SIA's *2018 Staffing Firm Market Share Landscape and Book of Lists -- North American Edition* ("SIA 2018 Rankings), which is one of the major sources of publicly-available industry data that Randstad

considers when identifying its competitors. In the SIA 2018 Rankings, SIA ranked the largest temporary staffing firms in the United States based on self-reported 2017 total year revenue. SIA ranked Collabera as among the top 10 largest temporary staffing firms in the United States for the IT segment.

25. As reflected in the SIA 2018 Rankings, Randstad and Collabera occupy a very similar position within the IT staffing market: both companies obtain their largest volume of temporary staffing revenue from the same market segment (IT), and both companies rank among the 10 largest US staffing firms in this segment. Based on SIA's rankings and my personal observations, I consider Collabera to be one of Randstad's major competitors in the IT staffing segment.

26. Moreover, I have reviewed a list of all locations in the United States where Collabera has a branch office providing temporary staffing services per Collabera website. In a majority of those locations, Randstad provides the same types of staffing services.

27. It is my belief that Luma's employment with Collabera constitutes a serious threat to Randstad's business that, if not enjoined by the Court, will cause immediate irreparable harm to the company. As a senior executive, Luma was intimately involved in reviewing and advising on sales strategies related to all of Randstad's business lines.

28. Indeed, for the past several years, Collabera has attempted to recruit several Randstad senior executives, including Mr. Luma, and including for the CSO role. It is apparent to me from these repeated attempts that Collabera is intent upon obtaining Randstad's Confidential Information so that it can compete unfairly with Randstad.

29. As noted above, Luma not only has intimate knowledge of Randstad's business strategies for the next 12 months but was a principal architect of those strategies. Preventing him

from being able to take that knowledge to the competitor is the precise reason why Randstad requires senior executives like Luma to sign non-compete covenants, and I urge the Court to enforce the obligations to which Luma committed in his agreement with Randstad.

[*Signature on following page*]

FURTHER AFFIANT SAYETH NOT.

GRAIG PAGLIERI

STATE OF Georgia

COUNTY OF Fulton

Personally appeared before me, Graig Paglieri, either being personally known to me or proven by satisfactory evidence, and acknowledged that he signed the foregoing document.

This the 29th day of August, 2018.

Notary Public LINDA EARLY
(Type or Print Name)

My commission expires: May 16, 2021

(Notary Seal) LINDA EARLY NOTARY EXPIRES GEORGIA MAY 16, 2021 PUBLIC COBB COUNTY



42033564v.3

# EXHIBIT 1

randstad

Professionals

**Employee Non-Competition and Confidentiality Agreement**
*(Not for use in California)*

This Employee Non-Competition and Confidentiality Agreement (this "Agreement") is made and entered into by and between Jeff Luna ("Employee") and Randstad Technologies, LP, a Delaware limited partnership, with its principal place of business in Atlanta, Georgia (hereinafter the "Company").

WHEREAS, the Company desires to employ or continue employing Employee and to provide Employee with valuable training and access to the Company's Confidential Information and Trade Secrets; and the Employee desires such employment, training and access.

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, Employee and the Company agree as follows:

1. **At-Will Employment**. The Employee acknowledges that the Employee's employment with the Company is at-will and not for any prescribed term, meaning either party may terminate Employee's employment at any time, for any reason (except those reasons prohibited by law), with or without notice and with or without cause. The Employee's entitlement to compensation ends when the Employee's employment terminates for any reason. The parties acknowledge that Employee's duties, compensation, title and responsibilities may change over time; notwithstanding any such changes, the Employee will continue to have access to the Company's Confidential Information and Trade Secrets and this Agreement, unless modified in writing, shall continue to apply and be valid.

2. **Definitions**. For the purposes of this Agreement, the following definitions shall apply:

(a) "Business of the Company" means the services provided by the Company, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, solutions services or other services that are the same as or substantially similar to the services Employee provided on behalf of the Company within two (2) years prior to the date of Employee's separation from the Company.

(b) "Confidential Information" means data and information belonging to the Company (i) relating to the Business of the Company, (ii) which has been disclosed to the Employee or of which the Employee became aware as a consequence of or through Employee's relationship with the Company, (iii) which has value to the Company, and (iv) which is not generally known to the public or the Company's competitors. Without limiting the generality of the foregoing, "Confidential Information" includes the Company's proprietary processes and methods of operation, pricing, margin and mark-up information, strategic plans, training techniques and manuals, recruitment and placement strategies and targets, financial data and projections, sales and marketing information, personnel information, information concerning Placement Candidates and Talent (such as employment preferences, salary requirements/history, contact information, availability, customer feedback and interpersonal skills), and information concerning actual or prospective customers (such as hiring preferences, staffing needs, hiring manager contact information, pricing and job orders). Notwithstanding anything herein to the contrary, the term "Confidential Information" shall not be interpreted to include or mean any data or information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by the Employee without authorization from the Company), or that has been independently developed and disclosed by others, or that enters the public domain through lawful means.

(c) "Material Contact" means any contact between Employee and a customer, Placement Candidate or Talent (i) with whom or which Employee dealt on behalf of the Company; (ii) whose dealings with the Company were coordinated or supervised by the Employee; (iii) about whom Employee obtained Confidential Information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in

compensation, commissions, or earnings for the Company within two (2) years prior to the Employee's separation from employment with the Company.

(d) "Personal Information" consists of a person's first and last name (or first initial and last name), plus one or more of the following: (i) Social Security number; (ii) driver's license number or state-issued identification card number; (iii) bank account or other financial account number; (iv) credit or debit card number; or (v) (where provided by law) the person's e-mail address.

(e) "Placement Candidate" means (i) any person who was identified by the Company for placement on an assignment with a customer as of the date of Employee's separation of employment with the Company or (ii) any person who completed an assignment with the Company within the twenty-four (24) months prior to the date of Employee's separation of employment with the Company and is eligible to be placed on assignment with a customer again.

(f) "Restricted Territory" means the following geographic territory to the maximum extent determined to be reasonable by a court of competent jurisdiction:

(i) a radius of twenty-five (25) miles of any office(s) to which Employee was assigned or which Employee managed, during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(ii) a radius of twenty-five (25) miles of any office(s) in which Employee performed services on behalf of the Company at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company;

(iii) a radius of twenty-five (25) miles of any office(s) in which the Company employed personnel whom Employee directly or indirectly supervised or managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and

(iv) any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company.

(g) "Talent" means any employee who is placed by the Company on an assignment with a customer as of the date of Employee's separation of employment with the Company.

(h) "Trade Secrets" means Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar applicable law.

3. **Entrustment and Preservation of Confidential Information and Trade Secrets.**

(a) The Employee acknowledges that Confidential Information and Trade Secrets are valuable, special and unique assets of the Company's business. In the course of Employee's employment with the Company, the Company will disclose to Employee and grant Employee access to Confidential Information and Trade Secrets, and Employee desires to be, and will be, entrusted with such Confidential Information and Trade Secrets during employment by the Company. In consideration of the Company's entrusting to the Employee certain of its Confidential Information and Trade Secrets, the Employee shall not directly or indirectly reproduce, use, distribute, disclose, publish, or misappropriate any Confidential Information or Trade Secrets on behalf of Employee or any person or entity other than the Company for any purpose whatsoever (i) at any time during Employee's employment with the Company, and (ii) after Employee's separation from employment with the Company (for any reason) for so long as the information in question meets the definition of Confidential Information set forth in Section 2(b), up to a maximum of two (2) years from the date of such separation of employment; provided that as to any Confidential Information that constitutes a Trade Secret under applicable law, these restrictions shall apply for so long as the

information remains a Trade Secret. The Employee acknowledges that any such prohibited use or disclosure of Confidential Information or Trade Secrets is likely to cause irreparable harm and financial loss to the Company.

(b) Unless done for and on behalf of the Company during Employee's employment by the Company, Employee will never use or disclose any person's Personal Information which Employee may learn or acquire at any time during employment with the Company. Furthermore, Employee shall at all times take appropriate measures to protect against the loss of, or damage to, Personal Information in the Employee's possession or control.

4. **Restrictive Covenants**. The Employee acknowledges that the Company has expended substantial amounts of money, time and effort in developing and maintaining its extensive personnel resources, Confidential Information, Trade Secrets, goodwill and relationships with customers, Placement Candidates, Talent and associate (internal) employees. Consequently, the Employee shall devote his or her best efforts, attention and energies to the Company's business at all times during his or her employment. Furthermore, in consideration of the Company's initial and continuing employment of the Employee, the Company's provision to the Employee of initial and ongoing training regarding the Company's business, and the Company's entrustment to the Employee of the Company's Confidential Information and Trade Secrets (without such training and entrustment of Confidential Information and Trade Secrets Employee acknowledges that he or she could not perform his or her job duties and responsibilities), the Employee agrees as follows:

(a) During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any person or entity other than the Company:

(i) contact, solicit, service, sell to, or attempt to contact, solicit, service, or sell to any customer of the Company with whom Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;

(ii) contact, solicit, service, place, or attempt to contact, solicit, service, or place any Placement Candidate or Talent with whom the Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;

(iii) contact, recruit, or solicit, or attempt to contact, recruit, or solicit any associate (internal) employee of the Company with whom the Employee worked at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for the purpose of encouraging, enticing or causing such associate (internal) employee to terminate employment with the Company, or to accept employment with any person or entity that competes with the Business of the Company; or

(iv) hire any associate (internal) employee of the Company with whom the Employee worked at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for any person or entity that competes with the Business of the Company.

(b) During his or her period of employment with the Company, Employee shall not, directly or indirectly, engage in (or own more than a five (5) percent interest in any entity which engages in) activities or services competitive with the Business of the Company.

(c) During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, operate, control, or own

any entity which engages in activities competitive with the Business of the Company (other than owning, as a passive investment, no more than a five (5) percent interest in any such entity).

(d) During Employee's employment with the Company and the twelve (12) month period immediately following the date of Employee's separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, on Employee's own behalf or on behalf of any person or entity other than the Company, hold any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company if such position involves:

(i) providing products or services competitive with the Business of the Company;

(ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company;

(iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or

(iv) engaging in responsibilities in which Employee would utilize or disclose Confidential Information.

(e) Within seven (7) days of the separation (for any reason) of Employee's employment with the Company, Employee shall delete social media connections, including LinkedIn connections, with any (i) customer of the Company with whom Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and (ii) Placement Candidates or Talent with whom the Employee had Material Contact at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company.

5. **Disclosure and Assignment of Inventions**. All discoveries, inventions, processes, designs, plans, writings, creations, programs, product improvements, materials, Confidential Information, and Trade Secrets ("Work Made for Hire") whether of a technical nature or not, made or developed by Employee alone or in conjunction with any other person or entity during the course of Employee's employment with the Company, which relate to or affect the business of the Company, shall be the sole and exclusive property of the Company. Employee shall disclose and release all such Work Made for Hire and all information regarding the same to the Company concurrent with the discovery or development of the same. Employee shall and hereby does assign all rights, title, and interest in any such Work Made for Hire to the Company. Employee shall not use or disclose the Company's Work Made for Hire to benefit a person or business that competes with the Company, a customer of the Company, an individual or other entity (except in performing his or her obligations to the Company during his or her employment with the Company), without the express, written permission of the Company. Employee hereby irrevocably assigns any such Work Made for Hire to the Company and shall execute and deliver promptly to the Company such assignments and other written instruments, and to do such other acts as may be required to patent, copyright or otherwise protect such Work Made for Hire and to invest the entire right, title and interest in such Work Made for Hire in the Company.

6. **Return of Company Documents and Equipment**. The Employee acknowledges that all originals, copies and summaries of manuals, memoranda, notes, notebooks, records, reports, plans, computer-based data in any form, tabulations or compilations, and other documents or items of any kind concerning any matters affecting or relating to the present or potential business of the Company, whether or not they contain Confidential Information or Trade Secrets, and all Company-owned equipment which may be provided for Employee's use while employed by the Company, are and shall continue to be the property of the Company. The Employee shall return to the Company all such documents and equipment in the possession or under the control of the Employee immediately upon the date of Employee's separation of employment with the Company or sooner if requested by the Company.

7. **Freedom to Contract**. The Employee represents to the Company that he or she has the legal right to enter into this Agreement without violating any other employment agreement or consulting arrangement, including any non-competition, non-solicitation or confidentiality agreements (collectively, "Other Contracts"), and that he or she will not become subject to any Other Contracts in conflict with this Agreement during the Employee's employment with the Company. Employee further represents that he or she will not upload to the Company's systems, disclose to the Company, or use for the Company's benefit any trade secrets or confidential information which is the property of any prior employer or other third party. If Employee fails to disclose or breaches any Other Contracts, the Company may incur significant legal exposure and expenses. Accordingly, in the event of any such failure to disclose or breach of Other Contracts, the Company reserves the right to terminate Employee's employment and to seek all available legal remedies in connection with the breach of the representations set forth in this Section.

8. **Enforcement and Damages**. The Employee acknowledges that the Company will suffer irreparable injury and damage and cannot be reasonably or adequately compensated in monetary damages alone for the loss by the Company of its benefits or rights under this Agreement as the result of a breach, default or violation by the Employee of any of his or her obligations under this Agreement. Accordingly, the Company shall be entitled, in addition to all other remedies which may be available to it (including monetary damages), to injunctive and other available equitable relief in any court of competent jurisdiction in Cobb County, Georgia to prevent or otherwise restrain or terminate any actual or threatened breach, default or violation by the Employee of any provision of this Agreement or to enforce any such provision. The Company will not be required to post any bond as a condition of the Company receiving such injunctive relief, and the Employee hereby specifically waives the right to request or require the posting of a bond as a condition of the Company receiving injunctive relief. The Employee shall reimburse the Company for all reasonable legal fees and costs incurred by the Company in connection with bringing a successful action to enforce this Agreement.

9. **Compliance with Policies/Procedure for Complaints**. The Employee shall comply with all applicable Company policies of which he or she has been made aware, including but not limited to those policies found in the Employee Handbook published on the Human Resources Department's page of Randstad Connect (https://www.randstadconnect.com/sites/HR). In addition, the Employee shall at all times act in conformity with the Company's Business Principles (http://www.randstad.com/corporate-governance/our-principles/business-principles), and the Employee acknowledges that he or she has been apprised of the Company's Misconduct Reporting Procedure (see link within Business Principles). In the event that a complaint is warranted under the Misconduct Reporting Procedure, the Employee may call 1-866-250-6706 or visit www.speakupfeedback.eu/web/integrityatrandstad/us. In connection with either reporting mechanism, the access code is 42115. The Employee acknowledges that by this Agreement, the Employee has been notified that if he or she has any questions or concerns about his or her employment, the Company's policies or principles, or if the Employee has a complaint of any kind concerning his or her employment, that the Employee has the right and is encouraged to notify his or her Human Resources (HR) Business Partner.

10. **Miscellaneous**.

(a) The Employee acknowledges that his or her obligations under this Agreement are personal and that he or she may not assign any of his or her rights or delegate any of his or her duties or obligations under this Agreement. The Company may assign, without notice to the Employee, its rights and obligations under this Agreement, which shall inure to the benefit of, and shall be binding upon, the successors and assigns of the Company.

(b) If, after executing this Agreement, Employee: (i) is promoted to, assigned to or otherwise assumes one or more positions or functions other than or in addition to Employee's position or functions at the time Employee signed this Agreement, regardless of title, or (ii) is transferred or assigned to or otherwise works for any affiliate, subsidiary or other division or business unit of the Company, the terms of this Agreement shall continue to apply with full force and effect.

(c) The Employee acknowledges that the covenants contained in Sections 3 and 4 are reasonable and essential to protect the Company's Confidential Information, Trade Secrets, goodwill and its relationships with customers, Placement Candidates, Talent and associate (internal) employees, and that such covenants will not impair the Employee's ability to procure subsequent comparable employment.

(d) This Agreement may be executed in two or more counterparts, all of which together shall constitute a single agreement. A copy, .pdf/.jpg or facsimile shall be treated as an original Agreement for all purposes.

(e) Each of the covenants and provisions contained in this Agreement is severable and shall be enforceable independently of every other provision. In the event that any provision of this Agreement shall be held to be overly broad in any respect (including, without limitation as to scope, geographic applicability, time period, activity or subject) so as to be unenforceable as written and agreed to by the parties, it is the parties' intention that such provision shall be construed by the appropriate court or arbitrator by limiting or reducing it so as to be enforceable to the fullest extent compatible with the then applicable law, and the parties hereby specifically request that any such court or arbitrator exercise its discretion consistent with this intention.

(f) If Employee previously executed other written agreements with the Company relating to the subject matter of this Agreement, and/or if Employee later enters into other written agreements that contain provisions similar to the provisions contained in this Agreement, all such provisions shall be interpreted to provide the Company with cumulative rights and remedies, and the benefits and protections provided to the Company under each such agreement shall be given full force and effect. No prior or contemporaneous agreement, whether written or oral, shall be construed to change, amend, alter, repeal or invalidate this Agreement.

(g) A waiver by one party of a breach of this Agreement by the other party shall not be construed as a waiver of any subsequent or similar breach.

(h) This Agreement may be amended or terminated only by written agreement of both parties.

(i) Nothing in this Agreement shall relieve Employee of any duties or obligations Employee has to the Company under statutory or common law, which include but are not limited to: fiduciary duties, the duty of loyalty, the duty not to tortiously interfere with business relationships, the duty not to engage in unfair competition, and the duty not to misappropriate any Trade Secrets.

(j) Employee acknowledges that the Company provided Employee with a copy of this Agreement prior to or concurrent with making an offer of employment, or an offer of change in Employee's job classification, or implementation of a merit increase or other change in the Employee's compensation and benefits, and informed Employee, prior to Employee's execution of this Agreement, that this Agreement is required as a condition of employment with the Company.

11. **Agreement Comprehension and Legal Advice**. The Employee represents that he or she has read this Agreement completely and carefully and that he or she understands the contents and effect of this Agreement. Employee further represents that he or she has had the opportunity to consult with an attorney before voluntarily signing below and has either consulted with an attorney or waived the opportunity to do so.

12. **Governing Law and Selection of Forum**. This Agreement and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the laws of the state of Georgia, without giving effect to provisions thereof regarding conflict of laws. Any claims arising out of or related to the covenants in Sections 3, 4, 5, and 6 of this Agreement, all claims arising under applicable law governing trade secrets, and all claims for emergency injunctive relief, must be litigated exclusively in the Superior or State Courts of Cobb County, Georgia, provided, however, that any such claim or cause of action may be brought in, or removed to, the United States District Court for the Northern District of Georgia, Atlanta Division, to the extent that such court would have jurisdiction over the subject matter of such action. The Employee and the Company waive any objection

based on personal jurisdiction and forum non conveniens and waive any objection to venue of any action instituted hereunder to the extent that an action is brought in the courts identified above. Each party agrees that a final judgment in any such action shall be conclusive and may be enforced in any other jurisdiction in any manner provided by law.

**IN WITNESS WHEREOF,** the parties have signed this agreement as of this 23 day of June, 2015.

**Employee:**

(Signature)

Jeff Luna
(Print Name)

**Randstad Technologies, LP:**

By:

Angela Harris SVP NO
(Print Name and Title)

# EXHIBIT 4

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO. ______________** |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**AFFIDAVIT OF RICHARD BROWN IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Richard Brown, declare as follows:

1. I am over 21 years of age, of sound mind, and competent to give the testimony in this Affidavit. I make this Affidavit upon my own personal knowledge and upon information provided to me by the records of Randstad Technologies, LLC ("Randstad") or information available through other employees of Randstad, except where it is expressly indicated otherwise. As to those matters stated on information and belief, I believe those matters to be true.

2. I make this Affidavit in support of Randstad's Emergency Motion for Temporary Restraining Order against the Defendants, Collabera Inc. ("Collabera") and Jeffrey Luma ("Luma").

3. I am employed by Randstad as Senior Information Security Risk Analyst, Enterprise Risk and Security. In that role, I am responsible for overseeing the execution of a comprehensive data security and IT risk management program to protect the confidentiality, integrity and availability of data, systems and networks, including conducting investigations

following the departure of high-level Randstad employees to confirm that no company trade secrets or confidential information is taken from the company or otherwise improperly used.

4. Randstad maintains a robust and comprehensive data security regime to ensure that its trade secrets and confidential information are protected both from external sources (i.e., outside of the company) and from internal sources (such as current and former employees).

5. As one part of Randstad's data security regime, when an employee leaves Randstad, our Data Loss Protection ("DLP") tool, Digital Guardian, can be utilized to analyze what actions a former employee may have taken to improperly replicate or to improperly remove company trade secrets or confidential information.

6. Among other functions, the Digital Guardian DLP tool can generate an "Exit Interview" report that analyzes whether a departing employee has engaged in any unusual patterns of printing documents from his or her company-issued computer in the weeks immediately prior to the employee's departure.

7. In addition, when an employee leaves Randstad (and particularly when leaving to go to work for a competitor), Randstad routinely reviews the employee's emails archived on Randstad's email server to assess any unusual email activity in the weeks prior to the employee's departure.

8. Moreover, when an employee leaves Randstad, we often review the employee's activities on the company's Google Drive, to which employees have access depending on their level of responsibility with the company. The Google Drive is a shared drive on which some Randstad employees perform day-to-day work and through which they have access to Randstad files and documents, including, in some cases, highly confidential files that are restricted to employees who have a legitimate need to access the files in question.

9. Randstad maintains these procedures due to the highly-competitive nature of its business and the need to protect its trade secrets and other confidential and/or proprietary information.

10. In addition, Randstad maintains various written policies to protect its trade secrets and other confidential and/or proprietary information.

11. For example, Randstad maintains an Access Policy which provides that computer systems used by employees are "the private property of Randstad" and are "for authorized use only." A true and accurate copy of the Access Policy is attached as **Exhibit 1**.

12. In addition, Randstad maintains a Company Property and Resources Policy that it promulgates in its Employee Handbook. Among other provisions, that policy provides that "[c]onfidential, proprietary and trade secret information and trade service marks of the Company are the exclusive property of Randstad and may not be used and/or disclosed outside the company without express written consent of the legal department." A true and accurate copy of the Company Property and Resources Policy is attached as **Exhibit 2**.

FURTHER AFFIANT SAYETH NOT.

Richard Brown

RICHARD BROWN

STATE OF GA

COUNTY OF Cobb

Personally appeared before me, Richard Brown, either being personally known to me or proven by satisfactory evidence, and acknowledged that he signed the foregoing document.

This the 30 day of August, 2018.

Lea Powers

Notary Public LeaAnn Powers
(Type or Print Name)

My commission expires: ____

LEA ANN POWERS
MY COMMISSION EXPIRES
NOTARY
PUBLIC
AUGUST 10, 2022
PAULDING COUNTY, GEORGIA

(Notary Seal)

# EXHIBIT 1

# section 7:
# company property and resources

### 7.1 – Confidential & Proprietary Information

Confidential, proprietary and trade secret information and trade or service marks of the Company are the exclusive property of Randstad and may not be used and/or disclosed outside the company without express written consent from the legal department. Confidential information includes any and all information relating to development, research, marketing activities, strategic plans and business and financial performance of any unit of the Company. It also includes the identity and individual needs of Randstad's client companies and prospective client companies, vendors, and prospective vendors; and the people and organizations with which you have relationships through the Company and the nature of those relationships.

Confidential information also includes all information that Randstad may receive or has received from others with the understanding that it will not be disclosed. Trade secret information includes all information considered by applicable law to be trade secrets and treated as such by Randstad. Confidential, proprietary and trade secret information is to be kept strictly confidential.

Randstad procedures, operations, research findings, sales results, financial performance, strategies and similar non-public information should not be discussed with anyone outside of the company – including media or representatives of another company – without the permission of the managing director or his/her designee for that particular area of the business. All confidential and proprietary information of the Company is the property of Randstad even after the employment relationship ends, regardless of the reason. You have a continuing obligation to respect the confidentiality of information that pertains to the business of Randstad that you may have obtained during your employment. If any of the foregoing types of non-public information is requested by anyone outside of Randstad, the appropriate managing director and/or the Legal Department should be notified. Until you obtain proper guidance, do not disclose the information.

Nothing in this handbook is intended to prohibit any activities by employees permitted under the National Labor Relations Act, or any other applicable federal, state or local law, including, but not limited to, protected concerted activity, discussions of wages, benefits and working conditions, or lawful contact or discussions with the media in response to inquiries on those matters or other non-confidential company information (as described in this Section 7).

### 7.2 – Social Media Policy for Randstad Business-Related Purposes

This policy governs use of social media by employees and/or contractors of the Company for business-related purposes. Randstad's Electronic Communications Policy governs Randstad employees' and contractors' personal use of social media using Company resources.

For the purposes of this policy, social media means any facility for online publication and commentary, including without limitation: blogs, wikis, forums, multi-media, and social sites such as Twitter, LinkedIn, Facebook, Google+, YouTube, Yelp, SlideShare, Flickr, and all other digital and on-line media. This policy is in addition to and complements any existing or future policies regarding the use of technology, computers, email and the internet.

Randstad encourages the ethical, sensible, transparent and responsible use of social media to promote and market the Company's services. Employees and contractors who use social media for these purposes must comply with this policy.

Publication and commentary on social media carries similar obligations to any other kind of publication or commentary. Employees who use social media for business-related purposes must follow the applicable policies set forth in the Employee Handbook and this policy. Randstad will provide an introductory course to social media during on-boarding. Please also check the Learning Management System often for new courses on social media training.

**1. Set up Social Media For Randstad Business-Related Purposes**
Use of social media is completely voluntary and is not compensable outside of normal work hours. You can use your own social media identity. All employees shall adhere to the Terms of Use of the social media platform they are using (e.g. Facebook, Twitter, Google+, etc.). Local and regional business related social media accounts are prohibited. Should you need help with social recruiting or social selling, please check the Learning Management System and then contact Group Marketing for a micro-campaign. Social media for internal business related purposes should be reviewed and approved by Group Marketing to ensure confidential company information is not shared publically. Additionally, employees' use of social media is subject to all other applicable Randstad policies.

**2. Don't Share Company Secrets**
It is perfectly acceptable to talk about your work and have a dialog with the community, but it is not okay to publish or otherwise disclose confidential information of the Company through social media sites. Examples of confidential information include but are not limited to the following items: non-public details about our procedures, current projects, business relationships, development plans, inventions, pricing with customers, embargoed corporate information, research, protected health information, social security numbers, and trade secrets. Respect the wishes of our corporate customers regarding the confidentiality of current and upcoming projects. Be mindful of the competitiveness of our industry. Nothing in this section is meant to prohibit discussions of wages, working conditions or any other protected concerted activities.

**3. Protect Yourself When Making Randstad Business-Related Communications**
Social media privacy settings on non-personal, Randstad platform should be set to allow anyone to see profile information similar to what is on the Randstad website. Be mindful of posting information that you would not want the public to see.

**4. Be Honest And Transparent in Randstad Business-Related Communications**
Do not make knowingly false representations about your Randstad credentials or work or services offered by Randstad. Nothing gains you more notice in social media than (dis)honesty. If you have an interest in something you discuss, say so. Remember: what you publish will be around for a long time, so consider content and be cautious about disclosing personal information. Do not make any maliciously false statements about Randstad or any of its competitors or clients.

Employees should be transparent in disclosing to their audience that they are connected to Randstad when they are promoting Randstad or its services. When using "hashtags" make sure that it makes a prominent connection between you and Randstad. Do not abbreviate hashtags. Do not abbreviate "Randstad". When posting or making statements about any Company promotions or comparative claims, be sure to include any limitations or qualifications with respect to those promotions or claims. If additional terms and conditions or explanation are necessary include a full link where the reader can find more details. Do not associate another party's persona or brand with Randstad unless you have been given permission to do so from that party or person and/or the appropriate Randstad department.

**5. Respect Intellectual Property in Randstad Business-Related Communicatiosn**

Intellectual property includes the copyrights and trademarks of Randstad and other parties. Employees shall respect laws governing copyright and fair use or fair dealing of copyrighted material owned by others, including Randstad copyrights and brands. Never quote more than short excerpts of someone else's work, and always give people proper credit for their work (including pictures). If you can, use a direct link. Treat all Randstad trademarks and servicemarks as trademarks and servicemarks and not as generic terms. For registered marks distinguish with an "®" in superscript, if possible.

**6. Honor Differences in Randstad Business-Related Communications**

The public in general, and Randstad employees and customers, reflect a diverse set of customs, values, and viewpoints. Postings regarding Randstad's business and your role in that business should not contradict information contained on Randstad's site. All Company related posting and statements on social media are subject to and should not violate Randstad's policies against harassment and discrimination, nor should they constitute unlawful conduct. All postings should reflect an appropriate degree of consideration for the rights and feelings of others. Use your best judgment and, when expressing a personal opinion, make it clear that the views and opinions expressed are yours alone and do not represent the official views of Randstad. At the same time, be cautious to avoid what could be perceived as possible conflicts of interest.

**7. Protect Others When Making Randstad Business-Related Communications**

Never identify a customer, partner, or supplier by name without explicit permission and never discuss confidential details. It is acceptable to discuss general details about types of projects and to use non-identifying customer pseudonyms (e.g., "Customer XYZ") as long as the information provided does not violate any non-disclosure agreements that may be in place with the customer or make it easy for someone to identify the customer. Social media is not the place to "conduct business" with a customer.

**8. Press Inquiries Related To Randstad Business-Related Communications**

Some social media activity may generate media inquiries. If the media contacts you about a Randstad related post or requests information, remember that it is important that one person speaks for Randstad to deliver an appropriate message and to avoid giving misinformation in any media inquiry. An appropriate answer may be "I am not authorized to comment on behalf of Randstad (or I do not have the information you are requesting), let me have someone at Randstad corporate contact you." Remember that nothing in this section prohibits an employee from discussing wages, working conditions or other non-confidential or non-proprietary company information in response to media inquiries.

**9. Keep Your Cool When Making Randstad Business-Related Communications**

If you see misrepresentations made about Randstad, feel free to point it out with respect and with the facts. If you speak about third parties, make sure what you say is factual. Avoid arguments. Brawls may earn web traffic, but nobody wins. Don't try to settle scores or goad competitors or others into inflammatory debates. Make sure what you're saying is factually correct. You should inform the Digital Marketing Team or Group Marketing immediately if the situation begins to escalate or if you are unsure how to proceed in any situation.

**10. Did You Mess Up When Making Randstad Business-Related Communication?**

If you make an error, be up front about your mistake and correct it quickly. If you modify an earlier post, make it clear that you've done so. If someone accuses you of posting information in violation of any law, contact the Legal Department immediately. Do not change or delete the post until authorized to do so by the Legal Department.

**11. Be Professional When Making Randstad Business-Related Communications**
Use your good judgment and comply with all applicable Randstad policies and laws when making any Company business-related postings or on-line statements.

**12. Use Disclaimers When Making Randstad Business-Related Communications**
Many social media users include a prominent disclaimer saying who they work for, but that they're not speaking officially. Always disclose that while you work for Randstad, anything you publish is your personal opinion, not necessarily the opinion of Randstad. For this reason, include this disclaimer in a visually prominent place: *"Views expressed on this [post, blog, etc.] are my own and do not necessarily reflect the views of Randstad."* If you appear in a video, preface your comments by making it clear that you're not an official spokesperson and that your opinion doesn't necessarily reflect that of Randstad.

**13. Bring Joy When Making Randstad Business-Related Communications**
The best way to be interesting, stay out of trouble, and have fun is writing about what you know. Quality matters so use a spell-checker. If you're not design-oriented, ask someone who is whether your site looks decent, and consider their advice on how to improve it. Also – and this can't be understated – use a warm tone. The ease and speed of publishing your thoughts is both a great feature and a great downfall of social media. The time to edit or reflect must be self-imposed. If in doubt over a post or if something doesn't feel right, let it sit and review it before publishing it.

**14. Keep Commitments When Making Randstad Business-Related Communications**
Make sure that social media and online activities don't interfere with your job duties or customer commitments.

**15. Policy Enforcement**
Randstad reserves the right monitor Social Media usage. Violations of this policy will be subject to disciplinary action, up to and including termination.

# EXHIBIT 2

## Randstad Access Policy!

This computer system is the private property of Randstad USA, whether individual, corporate or government. It is for authorized use only. Users (authorized or unauthorized) have no explicit or implicit expectation of privacy.

Any or all uses of this system and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to your employer, to authorized site, government, and law enforcement personnel.

By using this system, the user consents to such interception, monitoring, recording, copying, auditing, inspection, and disclosure at the discretion of such personnel or officials. Unauthorized or improper use of this system may result in civil and criminal penalties and administrative or disciplinary action, as appropriate.

By continuing to use this system you indicate your awareness of and consent to these terms and conditions of use.

LOG OFF IMMEDIATELY if you do not agree to the conditions stated in this notice.

OK

ID# 2018-0123258-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
AUG 31, 2018 10:19 AM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER 18106542

$8.00 COST PAID

Randstad Technologies, LLC

**PLAINTIFF**

**VS.**

Collabera Inc.
Luma, Jeffrey

**DEFENDANTS**

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**1075 Peachtree Street, N.E.**
**Suite 2500**
**Atlanta, Georgia 30309**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 31st day of August, 2018.**

Clerk of Superior Court

COBB COUNTY Georgia 1833 SUPERIOR COURT CLERK

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

COBB COUNTY, GA
FILED IN OFFICE
2018 AUG 31 PM 2:24
[signature]
COBB SUPERIOR COURT CLERK

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **RANDSTAD TECHNOLOGIES, LLC,** | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **FILE NO.** 18106542 |
| **COLLABERA INC. and JEFFREY LUMA,** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**[redacted] TEMPORARY RESTRAINING ORDER AND RULE NISI**

On August 31, 2018, Plaintiff Randstad Technologies, LLC ("Plaintiff" or "Randstad") filed a Motion for Temporary Restraining Order (the "Motion"). The Motion is supported by Randstad's Memorandum of Law, as well as the supporting affidavits of Richard Brown and Graig Paglieri. The Court heard oral arguments on Randstad's Motion on August 31, 2018 (the "Hearing"). Defendants were provided advance notice of the Hearing and given the opportunity to attend.

The Court believes immediate consideration is appropriate in light of the evidence presented. After considering all evidence, it appears to the Court from the specific facts shown that Plaintiff has met the standards applicable to the award of a temporary restraining order. See Garden Hills Civic Ass'n v. MARTA, 539 S.E.2d 811, 812-13 (Ga. 2000).

IT IS HEREBY ORDERED THAT, pursuant to O.C.G.A. § 9-11-65, from the date of entry of this Order until the resolution of Randstad's Motion for Preliminary Injunction, Defendants, including their agents, representatives, employees, and/or anyone else active in concert or participation with them who receives notice of this Order by personal service or otherwise, are hereby ordered as follows:

1. Defendants are enjoined from directly or indirectly accessing, using, disclosing, disseminating or making available Plaintiff's trade secrets or its confidential and/or proprietary information to any person or entity other than Plaintiff;

2. Defendant Luma is enjoined from working for Defendant Collabera Inc. or from otherwise, directly or indirectly, on Luma's own behalf or on behalf of any person or entity other than Plaintiff, holding any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the business of Plaintiff in violation of the terms of the Executive Non-Competition and Confidentiality Agreement (the "Agreement") attached to this Order as Exhibit A;

3. Defendant Luma shall comply with all provisions of the Agreement relating to non-solicitation of Plaintiff's customers and employees and non-disclosure of Plaintiff's trade secrets, confidential and/or proprietary information;

4. Defendant Luma shall deliver (within 7 business days of entry of this Order) to the offices of Plaintiff's counsel, Seyfarth Shaw LLP, located at 1075 Peachtree Street, Suite 2500, Atlanta, Georgia 30309: (i) any computer devices or electronic storage media or devices in his possession, custody, or control that currently or previously contained any of Plaintiff's trade secrets or other confidential or proprietary information, and (ii) any other property of Plaintiff, in any format, in his possession, custody or control;

5. Defendant Luma shall identify (within 7 business days of entry of this Order) any and all Randstad customers, placement candidates, and employees whom Luma, or anyone acting on his behalf, has solicited or otherwise contacted since July 31, 2018, including: (a) the date(s) and time(s) the contact occurred; (b) the name of the person(s) contacted; (c) the method(s) of communication; and (d) a description of what was discussed; and

6. Defendants shall immediately preserve all data and information in their possession, custody, or control, of any type and however maintained, pertaining to Plaintiff's business or the allegations set forth in Plaintiff's Complaint in this action, including, but not limited to, data and information in an electronic format.

7. Plaintiff's Motion for Preliminary Injunction shall be heard by this Court on September 11th, 2018 at 11:00 a.m./p.m. in Courtroom 2000.

8. Plaintiff shall serve this Order on Defendants.

IT IS SO ORDERED, this 31st day of August, 2018, at 1:55 a.m./p.m.

Michael Stoddard
Judge, Superior Court of Cobb County

MICHAEL STODDARD, SENIOR JUDGE
SUPERIOR COURTS OF GEORGIA
PRESIDING IN COBB JUDICIAL CIRCUIT

COBB COUNTY, GA
FILED IN OFFICE
2018 SEP -5 PM 4:23
Rebecca Keaton
COBB SUPERIOR COURT CLERK

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

RANDSTAD TECHNOLOGIES, LLC,

Plaintiff,

vs.

COLLABERA, INC. and
JEFFERY LUMA

Defendant

CIVIL ACTION NO.:
18106542

**DEFENDANTS' EMERGENCY MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER GRANTED WITHOUT NOTICE**

COME NOW Defendants Jeffery Luma and Collabera, Inc. (collectively, "Defendants") and, pursuant to O.C.G.A. § 9-11-65, submit this Emergency Motion To Dissolve Temporary Restraining Order Granted Without Notice.

As explained in detail in Defendants' Memorandum of Law in support of this Motion, Plaintiff Randstad Technologies, LLC sought and obtained a Temporary Restraining Order against Defendants. However, because Plaintiff failed to comply with the notice requirements of O.C.G.A. § 9-11-65, the presiding judge was without jurisdiction to order the TRO, and it must now be dissolved.

In support of this Motion, Defendants rely on:

1. Defendants' Memorandum Of Law In Support Of Their Emergency Motion To Dissolve Temporary Restraining Order Granted Without Notice, attached as Exhibit "1";
    a. Affidavit of Killol Amin, Exhibit "A" to Memorandum of Law; and
    b. Affidavit of Defendant Jeffery Luma, Exhibit "B" to Memorandum of Law.
2. For the Court's convenience, Defendants also submit a Proposed Order herewith, attached as Exhibit "2" to this Motion.

Respectfully submitted this 4th day of September, 2018.

Douglas H. Duerr
Georgia Bar No. 231772
Brent D. Wasser
Georgia Bar No. 371372

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
404/659-6700
404/222-9718 (facsimile)

Attorneys for Defendants

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| RANDSTAD TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>COLLABERA, INC. and<br>JEFFERY LUMA<br><br>Defendant | ) | CIVIL ACTION NO.:<br>18106542 |

## Certificate of Service

I hereby certify that on this 4th day of September, 2018, I served a copy of the foregoing **EMERGENCY MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER GRANTED WITHOUT NOTICE** via U.S. Mail, postage pre-paid and e-mail, upon the following:

Robert C. Steven & Alex Meier
bstevens@seyfarth.com, ameier@seyfarth.com
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia 30309

Brent D. Wasser
Georgia Bar No. 371372

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
404/659-6700 (telephone)
404/222-9718 (facsimile)

# EXHIBIT
# "1"

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| RANDSTAD TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>COLLABERA, INC. and<br>JEFFERY LUMA<br><br>Defendant | ) | CIVIL ACTION NO.:<br>18106542 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER GRANTED WITHOUT NOTICE**

Defendants Jeffery Luma and Collabera, Inc. ("Defendants") submit this Motion for Dissolution of the Temporary Restraining Order ("TRO") wrongfully and maliciously obtained by Plaintiff Randstad Technologies, LLC on the afternoon of Friday, August 31, 2018 (i.e., the Friday before Labor Day weekend). In pursuit of its TRO, Plaintiff apparently represented to the Court that it provided notice of its Motion for TRO to Defendants and, by extension, an opportunity for Defendants to appear at any hearing on its Motion. Any such representation was false. Defendants were not provided notice and an opportunity to appear at the *ex-parte* hearing held on Plaintiff's Motion for Temporary Restraining Order. Because Plaintiff failed to comply with the notice requirements of O.C.G.A. § 9-11-65, the presiding judge was without jurisdiction to order the TRO, and it must now be dissolved.

Plaintiff's Motion for Temporary Restraining Order was file stamped by this Court on August 31, 2018 at 10:19AM. Defendants, however, were not emailed by Plaintiff regarding even its mere intention to bring this action and pursue a hearing until 11:08AM and, *even then*, Plaintiff's "notice" to Defendants constituted only token notice. For example, although Plaintiff had his mobile number and contacted Defendant Luma by cell phone in the weeks leading up to the filing of its Motion for TRO, Plaintiff did not contact Defendant Luma by phone for the purpose of effecting notice of its Motion for TRO. Likewise, instead of calling a representative for Defendant Collabera, or even emailing a specific Collabera employee (e.g., its general counsel) to provide notice of this action, Plaintiff sent its "notice" email to a generic Collabera inbox with the address legal@Collabera.com. Of course, Plaintiff had no way to know if this email correspondence would, or even could, effect notice of its Motion or any hearing. Moreover, as Plaintiff acknowledged in its Complaint, Collabera is a New Jersey Company. Thus, it could have only appeared telephonically at any "same-day" hearing on Plaintiff's Motion. Nonetheless, Plaintiff never called Collabera. (*See generally*, Affidavits of Killol Amin ("Amin Aff.," attached as Exhibit "A") and Defendant Jeffery Luma ("Luma Aff.," attached as Exhibit "B")). Furthermore, once Plaintiff became aware its Motion would be heard, there was no email or other attempt to provide Defendants

notice and an opportunity to be heard. Such conduct is remarkable in this day and age of easy, instantaneous messaging.

As outlined above, Plaintiff took great pains to prevent both Defendants from discovering its intention to secretly obtain a hearing on the purported merits of its Motion for TRO. In this regard, Plaintiff was successful. Neither Defendant was provided notice of the existence of, much less the time or location, any hearing on the supposed merits of Plaintiff's Motion for TRO. In short, Plaintiff deliberately failed to provide either Defendant with notice of the hearing, (*See* Amin Aff., ¶ 4; Luma Aff., ¶ 4), and its Motion for TRO was thus granted without notice.

Under Georgia law, a presiding judge lacks jurisdiction to consider a Motion for TRO when the movant does not strictly comply with the requirements of O.C.G.A. § 9-11-65. *See Bellsouth Corp., v Forsee*, No. 2003CV64870, 2003 WL 25436590 (Ga.Super. Feb. 10, 2003).[1/] Under this Code section, a TRO may be entered without notice, as was done in this case, only if:

> (1) It clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and

---

[1/] *See also Bd. of Comm'rs v. Allgood*, 234 Ga. 9, 14 (1975) ("Compliance with this provision is jurisdictional; i.e., is mandatory."); *Mar-Pak Michigan, Inc. v. Pointer*, 226 Ga. 189, 189 (1970) ("Where an applicant for a temporary restraining order fails to comply with the foregoing statute, the judge of the superior court is without authority to grant such an order without notice.").

> (2) The applicant's attorney certifies to the court, in writing, the efforts, if any, which have been made to give the notice and the reasons supporting the party's claim that notice should not be required.

*Bellsouth Corp.*, No. 2003 WL 25436590 (citing O.C.G.A. § 9-11-65(b)) (emphasis added). Here, Plaintiff did not comply with either requirement.

First, Plaintiff did not provide any specific facts by affidavit showing that immediate and irreparable injury was likely to result before Defendants could be heard. To be sure, Plaintiff alleged in its Motion that Defendants possessed *the ability* to cause injury to its business. But Plaintiff did not present even a single alleged "fact" that would establish, or even suggest, that either Defendant was *actually causing* or endeavoring to cause Plaintiff injury. Indeed, Plaintiff even admits in its Motion that Luma's mere employment with Collabera was the trigger that caused it to "immediately file[] this action." *See Pl.'s Emergency Motion for Temp. Rest. Order with Accompanying Memorandum*, p., 10. Critically, Plaintiff does not allege that Defendants engaged or threatened to engage in any conduct actually injurious to it. Rather, Plaintiff bases its Motion only on its fear that Defendants *might* cause it injury. Such fear, however, is wildly insufficient to satisfy O.C.G.A. § 9-11-65's requirement that movants allege "specific facts" of "immediate risks." *See Bellsouth Corp.*, 2003 WL 25436590.

Second, Plaintiff's attorneys do not appear to have certified to the Court, in writing, its failure to give notice to Defendants of when the Motion would be heard

or the reasons supporting Plaintiff's presumptive belief that notice of the hearing should not have been required.

Plaintiff's failure to satisfy either of these requirements, much less both, operated to deprive the presiding judge of jurisdiction to grant Plaintiff's TRO. *See Bellsouth Corp.*, No. 2003 WL 25436590; *see also, Stewart v. McLean,* 252 Ga. 455, 456 (1984); *Allgood,* 234 Ga., at 14. Accordingly, the TRO must be dissolved in accordance with 9-11-65(b).[2/]

Respectfully submitted this 4 day of September, 2018.

Brent D. Wasser

Douglas H. Duerr
Georgia Bar No. 231772
Brent D. Wasser
Georgia Bar No. 371372

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.

---

[2/] In relevant part, O.C.G.A. § 9-1-65 states: In case a temporary restraining order is granted without notice, the motion for an interlocutory injunction shall be set down for hearing at the earliest possible time and shall take precedence over all matters except older matters of the same character; when the motion comes on for hearing, the party who obtained the temporary restraining order shall proceed with the application for an interlocutory injunction; and, if he does not do so, the court shall dissolve the temporary restraining order. On two days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification; and in that event the court shall proceed to hear and determine the motion as expeditiously as the ends of justice require.

Atlanta, Georgia 30303
404/659-6700
404/222-9718 (facsimile)
*Attorneys for Defendants*

# EXHIBIT
# "A"

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| RANDSTAD TECHNOLOGIES, LLC, Plaintiff, vs. COLLABERA, INC. and JEFFERY LUMA Defendant | ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.: 18106542 |

**AFFIDAVIT OF KILLOL AMIN**

Personally appeared before the undersigned officer, duly authorized by law to administer oaths in the State of Texas, Killol Amin, who is employed as General Counsel for Defendant Collabera, Inc. in the above styled case, and on oath states that:

1.

I am employed as the General Counsel for Defendant Collabera, Inc. I am over the age of twenty-one (21) and am of sound mind.

2.

Attached as Exhibit "A" are the only correspondences which I and/or Collabera received from Plaintiff Randstad Technologies, LLC relating to its Motion for Temporary Restraining Order.

3.

Based on Plaintiff's 11:08AM email of August 31, 31 2018, I understood that Plaintiff would notify me if a hearing was actually set on its Motion.

4.

Neither I nor any other Collabera employee received actual notice that a hearing on Plaintiff's Motion for Temporary Restraining Order was scheduled or conducted until after Plaintiff informed Collabera that its Motion had been granted. To this day, neither I nor anyone at Collabera know the time that any hearing on Plaintiff's Motion was held or the location where such hearing was held.

5.

Plaintiff did not call my office in an effort to notify me or any other Collabera attorney or representative of its pursuit of a hearing, or to inform myself or any other Collabera representative that a hearing on its Motion for Temporary Restraining Order had been set. Notably, the phone number for Collabera's headquarters is available on the internet.

6

Collabera is based in New Jersey and I am based in Texas. If Collabera been notified in advance that a hearing on Plaintiff's Motion was scheduled on August 31, 2018, I could have attended telephonically, and I would have done so if afforded the opportunity.

**<<<Signature on Following Page>>>**

Killol Amin

Dated: 09/04/2018

Sworn to and subscribed before me
this 4th day of September, 2018

Notary Public
My commission expires 02/24/2021

FRANCOIS NEDD
NOTARY PUBLIC
STATE OF TEXAS
NOTARY ID 12930840-0
02/24/2021

# EXHIBIT
# “B”

SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| RANDSTAD TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>COLLABERA, INC. and<br>JEFFERY LUMA<br><br>Defendant | ) | CIVIL ACTION NO.:<br>18106542 |

**AFFIDAVIT OF JEFFERY LUMA**

Personally appeared before the undersigned officer, duly authorized by law to administer oaths in the State of New Jersey, Jeffery Luma, Defendant in the above styled case, and on oath states that:

1.

I am over the age of twenty-one (21) and am of sound mind.

2.

Attached as Exhibit "A" are the only correspondences which I received from Plaintiff Randstad Technologies, LLC relating to its Motion for Temporary Restraining Order.

3.

Based on Plaintiff's 11:08AM email of August 31, 31 2018, I understood that

Plaintiff would notify me if a hearing was actually set on its Motion.

4.

I did not receive actual notice that a hearing on Plaintiff's Motion for Temporary Restraining was scheduled or conducted until Plaintiff informed me that its Motion had already been granted. To this day, I do not know the time that any hearing on Plaintiff's Motion was held or the location where such hearing was held.

5.

Plaintiff is in possession of my current cell phone number and has called me on my current cell phone number on numerous occasions over the past few weeks and months. Nonetheless, Plaintiff did not call me in an effort to notify me of its pursuit of a hearing, or to inform me that a hearing on its Motion for Temporary Restraining Order had been set.

6.

I would have obtained counsel and attended the hearing on Plaintiff's Motion for Temporary Restraining Order had I received notice of its scheduling.

**<<<Signature on Following Page>>>**

Jeffery Luma

Dated: 9/4/18

Sworn to and subscribed before me
this 4th day of SEPT, 2018

Notary Public
My commission expires 2/6/21

# EXHIBIT
# "2"

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| RANDSTAD TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>COLLABERA, INC. and<br>JEFFERY LUMA<br><br>Defendant | ) | CIVIL ACTION NO.:<br>18106542 |

**[PROPOSED] ORDER DISSOLVING TEMPORARY RESTRAINING ORDER GRANTED WITHOUT NOTICE**

The above-styled case is presently before the Court on Defendants' Emergency Motion To Dissolve Temporary Restraining Order Granted Without Notice. After careful consideration and for just cause shown, Defendants' Motion is **GRANTED**.

Defendants' Motion is supported by their Memorandum of Law, as well as the supporting Affidavits of Killol Amin and Defendant Jeffery Luma. Plaintiff Randstad Technologies, LLC was provided notice of the Motion on September 4, 2018.

After considering all of the evidence, the Court finds that Defendants have met the applicable standard for dissolving a temporary restraining order ("TRO"). In light of the foregoing, the Court **ORDERS** that the TRO issued in the above-

captioned matter on August 31, 2018 is **DISSOLVED** *ab initio.* Plaintiff's Motion for Preliminary Injection shall still be heard by this Court on September 11, 2018 at 11:00 a.m. in Courtroom 2000.

_______________________________
Judge, Superior Court of Cobb County

Prepared by:

Douglas H. Duerr
Georgia Bar No. 231772
Brent D. Wasser
Georgia Bar No. 371372

ELARBEE, THOMPSON, SAPP & WILSON, LLP
229 Peachtree Street, N.E.
800 International Tower
Atlanta, GA 30303
(404) 659-6700
(404) 222-9718 (Facsimile)

*Attorneys for Defendants*

ID# 2018-0131573-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
18106542
SEP 17, 2018 04:54 PM
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

**IN THE SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

**RANDSTAD TECHNOLOGIES, LLC,**

**Plaintiff,**

**v.**

**COLLABERA INC. and JEFFREY LUMA,**

**Defendants.**

**CIVIL ACTION**
**FILE NO. 18-1-06542**

## AFFIDAVIT OF SERVICE

COMES NOW KATHERINE BOLLING, before the undersigned officer duly authorized to administer oaths and, after being duly sworn on oath deposes and states that she has been permanently appointed by this Court for service of process per Order attached, she is a citizen of the United States, over the age of eighteen (18), and is a party having no interest in the above styled case, states that on August 31, 2018 at 1:42 PM, she served COLLABERA INC., by personally serving TIARA TYNER, Blumberg Excelsior Corp., Registered Agent, at her business located at 2000 Riveredge Parkway, Suite 885, Atlanta, Georgia 30328, with SUMMONS, COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES, PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY AND ORDER TO PRESERVE EVIDENCE and PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER WITH ACCOMPANYING MEMORANDUM.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September, 2018

Legal Ease Attorney Services, Inc.
645 Waldo Street
Atlanta, GA 30312
404-849-1240

Sworn to and subscribed before me this 5 day of September, 2018

Notary Public

My commission expires:

AMY FERRERO NOTARY PUBLIC MY COMMISSION EXPIRES JANUARY 28, 2022 FULTON COUNTY, GEORGIA

Filed In Office Jan-02-2018 09:27:1
18-0000243-CV
Page 1
Rebecca Keaton
Clerk of Superior Court Cobb County

IN THE SUPERIOR COURT OF COBB COUNTY

STATE OF GEORGIA

IN RE: Permanent Process Servers
Case Number: 18-1-0011

QL

## ORDER

The Cobb Superior Court Council of Judges having established a roster of permanent process servers pursuant to O.C.G.A. § 9-11-4(c) and the applicant below having submitted an application to be included on said rosr.ter, it hereby found as follows;

1.

The applicant has submitted an application through the Cobb Superior Court Administrator, whose responsibility it is to investigate and administer this order and to maintain the list of permanent process servers.

2.

Said application contains an endorsement of applicant by a member of good standing of the State Bar of Georgia.

3.

The Cobb Superior Court Administrator has conducted a Georgia Criminal Information Center (GCIC) criminal background check to insure applicant has not been convicted of any felony charge not discharged by the Georgia First Offender Act.

THEREFORE the application to be a permanent process server has been read and considered, said applicant is hereby appointed permanent process server of this court pursuant to O.C.G.A. § 9-11-4(c), from the date of this until January 4, 2019.

SO ORDERED this 22 day of December 2017.

GEORGIA, COBB COUNTY
I HEREBY CERTIFY THE WITHIN AND FOREGOING TO BE A TRUE, CORRECT AND COMPLETE COPY OF THE ORIGINAL THAT APPEARS ON RECORD.
CASE No. 18-1-0011 IN THIS OFFICE
THIS 31 DAY OF Jan 20 18
DEPUTY CLERK SUPERIOR COURT COBB COUNTY, GEORGIA

Presiding Judge
Cobb County Superior Court
Cobb Judicial Circuit

JAMES G. BODIFORD, SENIOR JUDGE
SUPERIOR COURTS OF GEORGIA
PRESIDING IN COBB JUDICIAL CIRCUIT

Applicant:
Ms. Katherine Bolling
645 Waldo Street
Atlanta, Ga 30312

Approved By: Thomas J. Charron
Court Administrator

Kimberly L. Hale
Judicial Administrative Manager